## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JANE DOE I and JANE DOE II, on behalf of themselves and all others similarly situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> UPMC, a Pennsylvania Nonprofit, Non-Stock Corporation, <br> *Defendant*. | C.A. No. 2:20-cv-359 <br><br> (Removal from: The Court of Common Pleas of Allegheny County, GD-20-001277) <br><br> Electronically Filed |

### NOTICE OF REMOVAL

Plaintiffs' case seeks to undermine UPMC's substantial efforts to fulfill longstanding federal policy to expand the use of electronic health records ("EHR") and bring the U.S. health infrastructure into the 21st century.  Plaintiffs challenge common methods by which both the federal government and private healthcare providers seek to increase patient engagement with EHR.  In UPMC's case, that engagement occurs largely through the online patient portal at MyUPMC.UPMC.com ("MyUPMC").  MyUPMC allows patients and their proxies to access health records remotely and to communicate with their physicians in a secure digital environment.  The portal is also a key part of how UPMC implements a partnership with the federal government, which specifically directs UPMC to achieve increasing benchmarks in the use of interoperable health technology.  Meeting these federal benchmarks means raising awareness of the MyUPMC portal, and Plaintiffs now assert that the means for doing so violate Pennsylvania law.  They seek recovery on behalf of a putative interstate and international class. The claims fail on multiple grounds—including that the information at issue is not protected health information, and that UPMC shares no protected health information outside of the portal—but their mere existence is effectively asking a court to intervene in the operation of a

federal program and hold that the federal government, UPMC, and most other healthcare systems are all violating state law.

Those kinds of claims belong in federal court.  Accordingly, pursuant to 28 U.S.C. §§ 1332, 1367, 1441, 1442, 1446, and 1453, and with full reservations of all defenses, Defendant UPMC gives notice of the removal of this action originally filed in the Court of Common Pleas of Allegheny County, Pennsylvania, to the United States District Court for the Western District of Pennsylvania.  In support of removal, UPMC provides this "short and plain statement of the grounds for removal."  28 U.S.C. § 1446(a); *see also Dart Cherokee Basis Operating Co., LLC v. Owens*, 574 U.S. 81, 87 (2014) ("By design, § 1446(a) tracks the general pleading requirement stated in Rule 8(a) of the Federal Rules of Civil Procedure.").[1]

## NATURE OF REMOVED ACTION

1.      On January 24, 2020, Plaintiffs—who seek to proceed anonymously under the pseudonyms Jane Doe I and Jane Doe II—filed a complaint in the Court of Common Pleas of Allegheny County alleging claims related to the operation of the online patient portal, MyUPMC, and UPMC's general website, UPMC.com (together, the "UPMC Websites").

2.      The Complaint—one of several similar lawsuits that Plaintiffs' counsel has filed across the United States—asserts that routine online practices violate a plethora of state laws. Two of these lawsuits have already been dismissed, with motion practice ongoing in others. None has resulted in any kind of liability.  Nor should they.  The online practices alleged here are commonplace features and functions of almost all websites, including those maintained by the federal government and private healthcare providers across the country.  Moreover, as one

---

[1] UPMC is the named defendant and appears here in the exercise of its rights of removal under federal law.  UPMC reserves all procedural, substantive, and other defenses, arguments, and claims available in response to the Complaint, including without limitation the defense that UPMC is not a provider or covered entity and is an improper defendant.

federal court already held in dismissing a similar case with prejudice, the kind of general, public browsing information at issue does not relate to the healthcare of any given individual and does not enjoy any special protection:  "Nothing about that information relates specifically to Plaintiffs' health."  *See Smith v. Facebook*, 262 F. Supp. 3d 943, 954-55 (N.D. Cal. 2017).

3.        Thus, while the Complaint uses selectively quoted snippets of isolated source code and UPMC's privacy disclosures to create an impression of impropriety, none of the information at issue in the Complaint is protected, and none of the allegations give rise to a claim.  UPMC uses health information technology ("health IT"), certified by the federal government, to provide patients and their proxies access to MyUPMC as a way to manage their healthcare directly through a secure online portal.  The innovative MyUPMC portal allows users, among other things, to view and download medical records to keep or share with other providers for coordination of care; securely communicate with their doctors; make and manage appointments; and otherwise control their health information.  None of *that* information is shared with outside entities except as allowed under federal law.

4.        The claims in this lawsuit thus suffer from myriad defects under both federal and state law.  But Plaintiffs' claims also implicate unique federal interests, making this case removable to federal court for at least two separate reasons.

5.        *First*, since at least 2004, the federal government has—through executive order, major legislation, and administrative programs—overseen the development of a nationwide infrastructure for health IT and EHR.  To achieve that goal, the federal government has established its own patient portal and sought to steadily increase its utilization among patients through targeted advertising.  The federal government has also encouraged private healthcare providers to develop and maintain their own patient portals, and has made special federal

payments to those providers that voluntarily endeavor to expand patients' use of portals and access to EHR in meaningful ways.  This case challenges the legality of techniques and practices that the federal government and the providers it pays use to meet that goal.  The action is therefore removable pursuant to the federal officer statute, 28 U.S.C. § 1442(a)(1).

6. *Second*, Congress has provided a separate vehicle to make sure that putative class actions like this one proceed in federal court.  UPMC is a Pennsylvania corporation and maintains its principal place of business and headquarters in the Commonwealth.  Members of the putative class, however, are citizens of other States and countries, and Plaintiffs' allegations satisfy the other prerequisites for removal pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).

## BASES FOR REMOVAL

**I.      Removal is Proper Pursuant to the Federal Officer Removal Statute, 28 U.S.C. § 1442(a)(1).**

7. The federal officer removal statute, 28 U.S.C. § 1442(a)(1), allows UPMC to remove this action.  This basis for removal exists to protect operations of the federal government from State interference.  *See In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Phila.*, 790 F.3d 457, 466 (3d Cir. 2015) ("*Def. Ass'n*") (citing *Watson v. Phillip Morris Cos., Inc.*, 551 U.S. 142, 150 (2007)).  Thus, "[u]nlike the general removal statute, the federal officer removal statute is to be 'broadly construed' in favor of a federal forum." *Id*. 466-67.

8. Removal under the federal officer statute is proper here because (1) UPMC is a "person" within the meaning of the statute; (2) Plaintiffs' claims are based upon UPMC's conduct in "acting under" the United States, its agencies, or its officers; (3) Plaintiffs' claims against UPMC are "for, or relating to" an act under color of federal office; and (4) UPMC raises

colorable federal defenses to the claims. *Def. Ass'n*, 790 F.3d at 467 (holding that state-court

disputes were properly removed where they pertained to how a Pennsylvania non-profit

administered authority delegated to it under federal law and how it utilized related federal funds);

*see also Golden v. N.J. Inst. of Tech.*, 934 F.3d 302 (3d Cir. 2019) (holding removal proper

where the dispute implicated governmental confidentiality interests under federal law).

**A.      UPMC is a "Person."**

9.       Any "person" acting under a federal officer may remove an action to federal court

pursuant to Section 1442(a)(1).

10.      "Because the statute does not define 'person,' [courts] look to 1 U.S.C. § 1, which

defines the term to 'include corporations, companies, associations, firms, partnerships, societies,

and joint stock companies, as well as individuals.'" *Def. Ass'n*, 790 F.3d at 467.

11.      UPMC is a Pennsylvania non-profit corporation. *See, e.g.*, Ex. 1.A ¶ 17.  It

therefore qualifies as a person for removal purposes. *Def. Ass'n*, 790 F.3d at 468 ("As a non-

profit corporation, the Defender Association of Philadelphia falls within this definition.").

**B.      UPMC is Acting Under a Federal Officer.**

12.       "The 'acting under' requirement, like the federal removal statute overall, is to be

liberally construed to cover actions that involve an effort to assist, or to help carry out, the

federal supervisor's duties or tasks." *Papp v. Fore-Kast Sales Co., Inc.*, 842 F.3d 805, 812 (3d

Cir. 2016) (marks and citation omitted).  The question is not whether the specific conduct alleged

in the Complaint was itself "at the behest of a federal agency.  It is sufficient for the 'acting

under' inquiry that the allegations are directed at the relationship between" the defendant and the

federal government. *Def. Ass'n*, 790 F.3d at 470.

13.      UPMC directly or indirectly owns 40 hospitals and hundreds of physician

practices (collectively, the "UPMC Providers") that operate over 700 clinical locations across

five States, with more than 7 million patient visits per year.  *See* UPMC Facts and Stats, Ex. A to

the Declaration of Rebekah Kcehowski ("Kcehowski Decl."), attached hereto as Ex. 2.

14.     The allegations here squarely target the relationship between the UPMC Providers

and the federal government.  Those providers contract with the government, provide care for

thousands of federally-subsidized patients every day, and help administer a nationwide federal

effort to expand the use of health IT.  The federal government makes special payments to

providers—including UPMC Providers—that increase patient engagement with EHR through the

use of online portals.  Plaintiffs' allegations pertaining to the design and functionality of the

UPMC Websites implicate how UPMC Providers execute this federal program, meet federally-

mandated criteria regarding health IT, and qualify for federal payments.

> 1.     **As one of the largest purchasers of healthcare services, the federal government has a unique interest in health IT.**

15.     The federal government plays a central role in healthcare in the United States

generally, and in the use of health IT in particular.

16.     Through the Department of Veteran Affairs ("VA"), the Department of Health

and Human Services ("HHS"), and the Centers for Medicare & Medicaid Services ("CMS"), the

federal government pays directly for, or subsidizes, healthcare for tens of millions of people

through massive programs like traditional Medicare, Medicare Advantage, and Medicaid.

Overall, the federal government is one of the largest purchasers of healthcare services, spending

over $1 trillion each year.

17.     To protect its interests, the federal government has emphasized the important role

that health IT plays in improving both the quality and efficiency of healthcare in the United

States.  As a federal officer within HHS recently explained:

> Federal agencies are purchasers, regulators, developers, and users of
> health IT.  Health IT supports activities that help federal agencies
> carry out their missions and serve the nation every day.  These
> activities include using EHR, data systems, and other health IT to
> conduct public health surveillance and research, directly provide
> healthcare services to patients, and administer government coverage
> programs such as Medicare and Medicaid.  In addition, federal
> agencies play a role in fostering a culture of privacy and security of
> individuals' health information among developers and users of
> health IT, protecting competition and innovation, and providing
> funding to conduct research on the use and expansion of health IT.

Office of the Nat'l Coordinator for Health Info. Tech., *2020-2025 Federal Health IT Strategic Plan* (Draft) at 7 (Ex. B to the Kcehowski Decl.).

18.     The federal government has also established specific offices to expand the use of EHR and other health IT.  First, the government established the National Health Information Technology Coordinator by executive order.  *See* Exec. Order 13335 (Apr. 27, 2004).  That office was charged with overseeing "nationwide implementation of interoperable health information technology in both the public and private health care sectors." *Id*.

19.     Congress then codified this model in the Health Information Technology for Economic and Clinical Health Act of 2009 ("HITECH Act").  That legislation created the Office of the National Coordinator for Health Information Technology ("ONC") and earmarked billions of federal dollars to help create, among other things, a "[h]ealth information technology architecture that will support the nationwide electronic exchange and use of health information in a secure, private, and accurate manner."  111 P.L. 5 § 3011(a)(1), 123 Stat. 115, 247 (2009) (codified at 42 U.S.C. § 300jj-31).

**2.    Achieving the federal government's objectives for health IT requires partnering with healthcare providers.**

20.    The federal government has enlisted private providers—including UPMC Providers—to help build that nationwide health IT infrastructure.

21.    The government "is pursuing a vision of a learning health system, in which a vast array of health care data can be appropriately aggregated, analyzed, and leveraged using real-time algorithms and functions."  ONC, *Federal Health Information Technology Strategic Plan 2011-2015* at 5 (Ex. C to the Kcehowski Decl.).  Achieving that vision requires the widespread adoption and meaningful use of EHR, which—in turn—requires collaboration with the private sector.  *See id*. at 1, 4, 8.

22.    In particular, healthcare providers are uniquely positioned to encourage individual patients to access and use EHR.  After all, there is no point to developing a nationwide health IT infrastructure if an insufficient number of patients use the system.  The government has thus sought to enhance "a provider's ability to influence patient engagement by providing a wider range of technologies and methods for a patient's use."  80 Fed. Reg. 62848.

23.    The government also sets federal specifications for the development of certified EHR technology ("CEHRT").  Private healthcare software companies design, develop, and maintain electronic systems necessary to support EHR databases.  The federal government sets the standards and technical specifications that such technology must meet.  *See* 45 C.F.R. § 170.315.  Once ONC certifies that a particular developer's product complies with these standards, that developer can market the product to providers as CEHRT.  The government in turn requires that providers use CEHRT in certain instances.

24.    With this framework in place, the federal government has spent the last decade actively seeking to expand the use of EHR and CEHRT among healthcare providers and patients.

Its primary method for doing so has been HHS' voluntary EHR Incentive Program, also known

as the Meaningful Use Program.  *See* ONC, *Federal Health Information Technology Strategic*

*Plan 2011-2015* at 4 (Ex. C to the Kcehowski Decl.); *see also* CMS, *Promoting Interoperability*

*Programs* (Ex. D to Kcehowski Decl.).

### 3. The federal Meaningful Use Program incentivizes private healthcare providers to expand the use of EHR and CEHRT.

25.     The Meaningful Use Program originated in the HITECH Act, which created an

incentive for providers to adopt the "meaningful use" of CEHRT and delegated to HHS the

authority to set criteria for determining meaningful use.  Pub. L. No. 111-5 § 4101, 123 Stat. 115,

467 (2009) (codified at 42 U.S.C. § 1395w-4).

26.     HHS structured the ensuing Meaningful Use Program in three stages.  The first

stage encouraged providers to adopt EHR and established specific objectives for its use.

Subsequent stages gradually increased the criteria for meeting those objectives and

demonstrating that patients continued to access and use EHR in greater numbers.  *See* 75 Fed.

Reg. 44321-22 (describing the three stages).

27.     To meet the federal criteria, the providers involved thus needed to both adopt

EHR and CEHRT, and show patients' increasing engagement over time.  Providers who met the

criteria at each stage qualified for higher federal payments from the government.  *See* 42 U.S.C.

§ 1395w-4.

28.     For instance, one objective of the Meaningful Use Program has been to "[p]rovide

patients the ability to view online, download, and transmit their health information within 4

business days of the information being available…."  80 Fed. Reg. 62815.  Compliance at Stage

2 required showing that more than 50 percent of Medicaid patients received access to view

online, download, and transmit to a third party their health information.  That percentage

increased to "more than 80 percent" for Stage 3.[2]

29.     Another objective has been to encourage the "capability for patients to send and

receive a secure electronic message" with their doctor.  80 Fed. Reg. 62818.  Stage 2 required

only the *capability* for patients to send and receive a secure electronic message.  The 2019

requirements for Stage 3 required showing that a certain percentage of patients were actually

using the capability.[3]

> ### 4.     Patient portals are the means by which the healthcare industry—including the federal government—encourages the use of EHR.

30.     Online patient portals have been the most effective and efficient way to meet

many of the objectives in the federal Meaningful Use Program.  CMS anticipated this in some of

its earliest rulemaking on the Program.  In announcing Stage 1 objectives for providing "patients

with timely electronic access to their health information," CMS intended "that this be

information that the patient could access on demand such as through a patient portal…."  75 Fed.

Reg. 44356.

---

[2] *Compare* CMS, *Medicaid EHR Incentive Program, Modified Stage 2 Patient Electronic Access* (Nov. 2016) (Ex. E to Kcehowski Decl.) *with* CMS, *Medicaid EHR Incentive Program, Modified Stage 3 Patient Electronic Access to Health Information* (Nov. 2016) (Ex. F to Kcehowski Decl.).  In developing this "phased approach," the federal government "intend[ed] to update the criteria of meaningful use" as the program progressed, 75 Fed. Reg. 44321, and specifics about the criteria, relevant measures, and potential exclusions could vary over time and according to provider.  The overall goal of developing interoperable health IT and increasing patient engagement with EHR has remained constant.  *See* ONC, *2020-2025 Federal Health IT Strategic Plan* (Draft) at 18 (Ex. B to the Kcehowski Decl.) (discussing the ongoing goal of interoperable health IT infrastructure).

[3] *Compare* CMS, *EHR Incentive Programs for Eligible Professionals: What You Need to Know for 2015 Tipsheet* (Ex. G to Kcehowski Decl.) *with* CMS, *Eligible Professional Medicaid EHR Incentive Program Stage 3 Objectives and Measures Objective 6 of 8* (Ex. H to Kcehowski Decl.).

31.     The utility of portals continued as the criteria for showing patient engagement developed.  *See* 77 Fed. Reg. 54007 ("Consistent with the Stage 1 requirements, we noted that the patient must be able to access this information on demand, such as through a patient portal or personal health record (PHR)"); *id*. at 54009 (noting that "[m]any CEHRT vendors already make patient portals available that would meet the certification criteria"); CMS, *Medicaid Promoting Interoperability Program Eligible Professionals Objectives and Measures For 2020 Objective 5 of 8* (Ex. I to Kcehowski Decl.) (setting program objectives for 2020, including that providers give patients "timely electronic access to their health information … on demand, such as through a patient portal").

32.     Indeed, before Stage 2 took effect, ONC advised that providers "will have better success meeting meaningful use requirements for stage 2 if you integrate a patient portal effectively in your practice operations," and that "stage 3 requirements may require that you use a patient portal to attest successfully."  ONC, *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements* (Ex. J to Kcehowski Decl.).

33.     Given the goal of increasing patient engagement, it was also not enough just to make "a portal available to patients…. The portal must be engaging and user-friendly, and must support patient-centered outcomes."  *Id*.  Driving providers to increase patient engagement and the use of EHR has been a foundation of establishing the nationwide, interoperable health IT infrastructure first envisioned in 2004.

34.     For instance, CMS maintains its own patient portal for individuals who access care through traditional Medicare—MyMedicare.gov.  The VA maintains its own portal for veterans, My HealtheVet.

35. CMS uses third-party cookies, analytics, and targeted advertising to increase patient engagement with its portal through outreach and site improvements. *See* Medicare.gov, *Privacy Policy* (Ex. K to Kcehowski Decl.). That includes many of the same third-party cookies, analytics, and targeted advertising alleged as unlawful in the Complaint.

36. CMS, in fact, identifies 23 separate third parties that it uses for advertising, web analysis, social media outreach, and privacy management in conjunction with Medicare.gov and MyMedicare.gov. *See* Medicare.gov, *Privacy Information Regarding Third-Party Services* (Ex. L to Kcehowski Decl.). These include, for instance:

    a. Three separate vendors—Media Math, Spongecell, and Resonate—to provide "behaviorally targeted advertising on third party websites to encourage consumers to visit … MyMedicare.gov";

    b. The use of "Web Beacons and Persistent cookies for Digital Advertising" through five different entities;

    c. Facebook, Twitter, LinkedIn, Google, and Bing advertising, including the use of cookies to place "digital ads on third-party and Google sites for both new users and to consumers who have visited Medicare.gov and MyMedicare.gov";

    d. Employing Google Analytics to collect and analyze "data on visitor interactions with … MyMedicare.gov to help make the site more useful to visitors"; and

    e. Six other outside vendors that analyze traffic on MyMedicare.gov, assess visitor interactions, or otherwise monitor site functionality.

37. CMS advises that its vendors "may use information collected automatically by visiting Medicare.gov, and combine it with data they collect elsewhere for targeted advertising purposes." *See* Medicare.gov, *Privacy Policy* (Ex. K to Kcehowski Decl.). CMS collects user information such as the device used, IP address, geographic location, pages visited, and "Your actions on Medicare.gov (like clicking a button)," and uses that data to improve visitors'

experience, optimize website content, and *"*personalize the content we show you on third-party

sites." *Id*.

38.     As CMS explains this practice:  "During a visit to Medicare.gov, a cookie is

placed in the browser of the devices used to view the website.  When that same device is used to

visit third-party websites that are displaying Medicare.gov ads, ads for Medicare.gov may be

shown to that device because it had previously visited Medicare.gov."  *Id*.  Such "tools enable

[CMS] to reach new people," thus potentially expanding the use of EHR even further.  *Id*.;

*compare also* Ex. 1.A ¶ 120(b) (parallel allegations from Plaintiffs' Complaint about the use of

cookies).

> **5.     UPMC Providers have been expanding the use of EHR and receiving incentive payments from the federal government under the Meaningful Use Program.**

39.     UPMC Providers have been part of the federal Meaningful Use Program at all

times since 2011.  Declaration of Kristin Powers ¶ 2, attached hereto as Ex. 3 ("Powers Decl.").

The federal government pays UPMC Providers for meeting program criteria and expanding

patients' access to and use of EHR.  *Id*. ¶ 6.

40.     The MyUPMC patient portal is the means by which UPMC Providers meet

certain requirements of the federal Meaningful Use Program.  *Id*. ¶ 3.  The portal is a digital

platform accessible online or through a custom app that gives patients and their proxies the

ability to manage their healthcare directly by, for instance:  viewing medical records, including

doctor's notes and lab results; downloading records to keep or share with other providers;

securely communicating with their doctors; making and managing their appointments; and

renewing prescriptions, among other things.  Declaration of Kathryn M. Scott ¶ 2, attached

hereto as Ex. 4 ("Scott Decl.").  Through continuous development, design, and improvement, the

portal is becoming the patient's (or his or her proxy's) "digital front door" to the UPMC health

system—the main access point that allows patients and their proxies to instantly and remotely engage with their provider—moving healthcare away from the traditional brick-and-mortar model and into the 21st century.

41.     UPMC utilizes federally certified EHR technology vendors to support the portal. *Id.* ¶ 3.  UPMC's vendors are among the most commonly used and well-respected CEHRT vendors in the healthcare industry.  The federal government certifies these vendors' products, including their security, according to the federal Health IT Certification Criteria.  *See* 45 C.F.R. § 170.315.

42.     In order for UPMC Providers to meet the criteria in the Meaningful Use Program, it is paramount both that patients know about the portal, and that their experience using the portal be—in the words of ONC—"engaging and user-friendly."  ONC, *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements* (Ex. J to Kcehowski Decl.); *see also* Powers Decl. ¶ 4.

43.     UPMC uses common web practices to communicate with patients about the MyUPMC portal across relevant websites (including UPMC's own general, publicly available website, www.UPMC.com) and improve website functionality.  Scott Decl. ¶ 6.  These practices are disclosed to patients through the UPMC Websites' terms of use.  *See* Ex. 1.A and Ps.' Exhibit 3.  They are also commonly found on websites maintained by CMS, other federal health agencies, private health insurers, and other health providers.

44.     For example, in addition to MyMedicare.gov, described above, other federal healthcare websites also utilize targeted marketing, web beacons, and Google Analytics or other analytic resources.  These include **www.healthcare.gov** (where consumers can purchase insurance); **www.opm.gov/healthcare-insurance/healthcare** (where federal employees can

manage their health plans); and **www.ssa.gov** (where people can manage their social security

benefits.  *See* CMS privacy notice for HealthCare.gov (Ex. M to Kcehowski Decl.); Office of

Personnel Management, Information Management Privacy Policy (Ex. N to Kcehowski Decl.);

Social Security Administration Internet Privacy Policy (Ex. O to Kcehowski Decl.).

45.    UPMC Providers have met federal Meaningful Use Program criteria because of

their use of the MyUPMC patient portal.  Powers Decl. ¶¶ 3, 6.

46.    UPMC Providers are also federal contractors for healthcare services.  They

contract with the VA to provide healthcare to veterans.  They also provide healthcare to

thousands of Medicare Fee for Service patients every day, and thousands more patients receiving

care under federally-subsidized Medicaid and Medicare Advantage insurance policies.

47.    Individual patients from each of these groups receive care at a UPMC Provider,

have their electronic records stored with UPMC's CEHRT vendors, and are eligible to sign up

for the MyUPMC patient portal to help manage their care.  Powers Decl. ¶ 3.  When they do so,

it furthers the federal government's policy and allows those patients immediate access to view

their electronic records and, if they choose, share that data with another provider or with the

federal government.  That is the burgeoning nationwide interoperable health IT infrastructure at

work.

48.    If it were directly responsible for each patient's care, the federal government

would itself be employing a patient portal and the kind of tracking and marketing techniques

identified in the Complaint—just as the federal government is already doing with

MyMedicare.gov and other sites.

49.    But where it lacks that direct relationship with patients, the federal government

uses doctors and hospitals like the UPMC Providers to deliver "a service the federal government

would itself otherwise have to provide." *Def. Ass'n*, 790 F.3d at 469.  The government delegates

to those healthcare providers the responsibility for executing the Meaningful Use Program,

expanding the use of EHR, and developing the nationwide health IT infrastructure.  *Id.* (noting

propriety of removal where "'Defendants received delegated authority'" (citation omitted)).

50.     UPMC's alleged use of techniques identified in the Complaint in this case is how

it carries forth its delegated authority.  *See* Powers Decl. ¶¶ 4-6; Scott Decl. ¶¶ 4-6.  UPMC was

thus acting under the authority of HHS and its agencies and officers in encouraging use of

MyUPMC and advertising that portal to patients online.  *See id.*; *see also Papp*, 842 F.3d at 812

("When, as occurred in this instance, the federal government uses a private corporation to

achieve an end it would have otherwise used its own agents to complete, that contractor is acting

under the authority of a federal officer." (marks and citation omitted)).

**C.     Plaintiffs' Claims Relate to Actions Under Color of Federal Office.**

51.     For removal pursuant to Section 1442(a)(1), the alleged conduct must "have been

undertaken 'for or relating to' a federal office."  *Papp*, 842 F.3d at 813.  To satisfy this aspect of

removal, "it is sufficient for there to be a 'connection' or 'association' between the act in

question and the federal office."  *Def. Ass'n*, 790 F.3d at 471; *see also Papp*, 842 F.3d at 813

(holding recent amendments to statute have fostered "a more permissive view" of this element).

52.     There is more than a *connection* or *association* between UPMC's alleged conduct

and the actions of UPMC Providers in meeting Meaningful Use Program criteria.  The

Complaint alleges that tracking online behaviors and utilizing direct marketing in conjunction

with patient portals and public medical websites violates Pennsylvania privacy law.  But as

CMS's own practices demonstrate, those are the methods for communicating with patients,

increasing their awareness of patient portals, and expanding the use of EHR—the very objective

of the federal Meaningful Use Program.

53.     Plaintiffs now allege that using common online tools to communicate with consumers about patient portals violates federal and state law.  According to the Complaint, IP addresses and the cookies and browser fingerprints that allegedly track web users are protected under HIPAA.  Ex. 1.A ¶¶ 17, 112, 117, 136.  In allegedly deploying those techniques to promote registration for the MyUPMC patient portal and make it a more engaging site, UPMC is purportedly acting both "[c]ontrary to its obligations as a provider" under Pennsylvania law of patient confidentiality, and negligently in violation of its duty to patients.  *Id*. ¶¶ 386, 430.

54.     Plaintiffs also claim that the targeted communications and analytic techniques alleged here constitute illegal wiretapping, unfair trade practices, and identity theft under Pennsylvania law.  *Id*. ¶¶ 404, 419.  According to the Complaint, privacy policies in "browsewrap statements" like those found at the bottom of the UPMC Websites—as well as the bottom of MyMedicare.gov and other federal websites, *see* Kcehowski Decl. ¶¶ 12-16—are "unenforceable."  Ex. 1.A ¶ 419(c).  As alleged in this case, tracking user activity on a website and using unique IP addresses to place advertisements with third-party sites is thus nonconsensual and, as a result, fraudulent and illegal.  *Id*. ¶¶ 391-428.

55.     Finally, Plaintiffs allege that the targeted communications supposedly used to encourage greater engagement with MyUPMC "effectively invit[e] the third parties [like Google] into Plaintiffs' and Class members' private and secluded data and space," in violation of Pennsylvania common law of intrusion.  *Id*. ¶ 437.

56.     These allegations are inextricably tied to—and certainly "connected" and "associated" with—UPMC's effort to meet federal Meaningful Use Program criteria.  *Def. Ass'n*, 790 F.3d at 471.  Plaintiffs are challenging common efforts by which CMS and others expand the use of EHR.  If Plaintiffs were to prevail in showing that the most common online methods for

meeting those benchmarks violate common law, it would substantially interfere with achieving

the policy objectives set forth in the HITECH Act and its implementing regulations.  *Golden*,

934 F.3d at 310 ("The central aim of the federal officer removal statute is to protect officers of

the federal government from interference by litigation in state court" (marks and citation

omitted)).  Federal review pursuant to 28 U.S.C. § 1442(a)(1) is therefore warranted.

      **D.**    **UPMC Raises Colorable Federal Defenses to Plaintiffs' Claims.**

    57.    The final element for federal officer removal requires that the defendant identify a

federal defense.  *Def. Ass'n*, 790 F.3d at 472.  This, too, is broadly construed in favor of federal

jurisdiction.  *Id*. at 472-74.  Arguments that federal law preempts state law suffice to warrant

removal under this element.  *Id*. at 473-74.  Similarly, where a complaint alleges the presence of

a duty under federal law, a federal defense exists for removal purposes where the defendant

denies it violated any such duty.  *Id*. at 473 (holding this element satisfied because defendant

"claim[ed] that it was not violating the terms of" a federal statute); *see also Golden*, 934 F.3d at

311 (holding that defendant raised a colorable federal defense by denying that the records at

issue "are federal records within the meaning of 44 U.S.C. § 3301").

    58.    UPMC will assert several colorable federal defenses to the claims at issue here.

    59.    *First*, UPMC will contend that the data at issue—the content of web searches, IP

addresses, cookies, and browser fingerprints—are not subject to HIPAA, contrary to the

allegations in the Complaint.  *See* Ex. 1.A ¶¶ 17, 23-26, 112, 117, 136.  Plaintiffs do not allege

the disclosure of medical records or secure communications between patients and physicians.

This case instead concerns generic online information that is anonymous or linked only to a

specific computer, not a person.

    60.    Assessing materially identical claims brought by the same attorneys who

represent Plaintiffs here, one federal court already rejected the argument that HIPAA protects

this kind of information.  *See Smith*, 262 F. Supp. 3d at 954-55 (holding that IP addresses and similar information did not "relate[] specifically to Plaintiffs' health" and were not "protected health information" under HIPAA).

61.    *Smith* alone makes UPMC's defense of the HIPAA-related allegations colorable and satisfies the final requirement for removal under Section 1442(a)(1).  *See Golden*, 934 F.3d at 311 (holding that a federal defense was present where defendant denied any violation of federal law); *Def. Ass'n*, 790 F.3d at 474 (same).

62.    *Second*, certain state-law privacy standards are preempted under HIPAA.  *See* 45 C.F.R. § 160.203.  The possibility of preemption is also enough to present a federal defense for removal purposes.  *See Def. Ass'n*, 790 F.3d at 474 (permitting removal on the basis of preemption).

63.    *Third*, the Dormant Commerce Clause blocks states from interfering with interstate commerce.  Any "state law that has the 'practical effect' of regulating commerce occurring wholly outside that State's borders is invalid under the Commerce Clause."  *Healy v. Beer Inst.*, 491 U.S. 324, 332 (1989).  And, "[b]ecause the internet does not recognize geographic boundaries, it is difficult, if not impossible, for a state to regulate internet activities without 'projecting its legislation into other States.'"  *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 103 (2d Cir. 2003) (citation omitted).

64.    Here, UPMC Providers are located in several States, including Maryland, New York, and Ohio.  Patients come to UPMC Providers from around the globe.  The UPMC Websites provide an easily accessible, interstate (and international) platform by which providers, patients, and others can manage or learn more about their or others' healthcare.  But according to the Complaint in this case, Pennsylvania law—including the legislative proscriptions of the

Commonwealth's wiretapping and trade practices statutes—restricts how UPMC can design and manage those websites. The Dormant Commerce Clause prohibits Pennsylvania from reaching beyond its borders in that way.

65.    *Finally*, the entire nature of UPMC's involvement in the Meaningful Use Program is "inherently federal in character because the relationship" between UPMC and HHS "originates from, is governed by, and terminates according to federal law." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001) (holding that state law claims stemming from defendant's representations to a federal agency were preempted). Federal judicial review is available to assess allegations about the nature of that relationship. *See Def. Ass'n*, 790 F.3d at 474 (permitting removal on the basis of *Buckman* preemption).

## II.    Removal is Proper Pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).

66.    This Court separately has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) (as amended by the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 14 ("CAFA")). CAFA grants federal courts original jurisdiction over a class action whenever: (1) "any member of a [putative] class of plaintiffs is a citizen of a State different from any defendant," *id*. § 1332(d)(2)(A); (2) "the number of members of all proposed plaintiff classes in the aggregate is" not less than 100, *id.* § 1332(d)(5)(B); and (3) "the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs," *id.* § 1332(d)(2).

67.    "CAFA's provisions should be read broadly, with a strong preference that interstate class actions should be heard in a federal court if properly removed by any defendant." *Dart*, 574 U.S. at 89. Indeed, one goal of CAFA was to provide for "[f]ederal court consideration of interstate cases of national importance under diversity jurisdiction." CAFA § 2.

68.    As an initial matter, while UPMC contests that class treatment is proper, this lawsuit is a proposed "class action" as defined by CAFA because Plaintiffs are representatives of

a putative class and they filed the case in state court pursuant to a state statute or rule of judicial procedure authorizing a class action. *See* 28 U.S.C. § 1332(d)(1)(B). Plaintiffs captioned their case as a "class action," seek relief "on behalf of themselves and all others similarly situated," and request certification of an identified class. Ex. 1.A at Cover, page 96, and ¶ 367.

69.     Venue in this Court is proper because the state court action is pending within the Western District of Pennsylvania.

### A.     The Parties Are Diverse.

70.     Under CAFA, there is "minimal diversity" so long as "any member" of the proposed class of plaintiffs is either "a citizen of a State different from [the] defendant," or is "a citizen or subject of a foreign state and any defendant is a citizen of a State." 28 U.S.C. § 1332(d)(2)(A)-(B). Courts consider the citizenship of all putative class members—both named and unnamed. *See id.* § 1332(d)(1)(D). Courts determine citizenship of the members of the proposed class as of the date of filing of the complaint. *See id.* § 1332(d)(7).

71.     UPMC is incorporated, and maintains its headquarters and principal place of business, in Pennsylvania, and is a citizen of this Commonwealth. So long as any one member of the putative class is a citizen of another State, diversity exists for purposes of removal under CAFA.

72.     Plaintiffs' proposed class is defined as "[a]ll Pennsylvania *residents* who are, or were, patients of UPMC or any of its affiliates, and who used UPMC's web properties, including, but not limited to, UPMC.com and the Patient Portal at myupmc.upmc.com." Ex. 1.A ¶ 367 (emphasis added).

73.     *Residency* is not the test for diversity. Courts instead look to *citizenship* to determine whether an individual is diverse. And, the two are not the same. *See Schwartz v. Comcast Corp.*, No. 05-2340, 2006 WL 487915, at *3 (E.D. Pa. Feb. 28, 2006) (asserting

jurisdiction over a class action under CAFA where the putative class comprised residents of Pennsylvania, but that was insufficient to show that *citizenship* was limited to Pennsylvania); *see also Mondragon v. Capital One Auto Fin.*, 736 F.3d 880, 884 (9th Cir. 2013) ("That a purchaser may have a residential address in California does not mean that person is a citizen of California."); *Ellithy v. Healthcare Training Institute, Inc.*, No. 2:12-cv-06209-CCC, 2013 WL 3480206, at *4 (D.N.J. June 21, 2013) ("[R]esidency is not the same as citizenship for purposes of diversity jurisdiction").

74.     The determination of a person's citizenship is a fact-specific question.  Courts consider several non-conclusive factors to consider in determining citizenship, including: (1) voting registration and practices; (2) location of personal and real property; (3) location of financial accounts; (4) memberships in unions, churches, clubs, fraternal organizations, and other associations; (5) place of employment or business; (6) driver's license and automobile registrations; and (7) location of payment of taxes.  *Schwartz*, 2006 WL 487915, at *5.  A critical focus, however, is on the intent of the individual.  *Id*. at *6.

75.     The putative class comprising all "Pennsylvania residents" necessarily captures individuals who may currently reside in Pennsylvania but who remain citizens of another State, as well as citizens of foreign countries.

76.     As one example, UPMC treats students from colleges and universities in Pennsylvania.  UPMC health insurance plans are offered to students—including international students—at, for instance, the University of Pittsburgh and Robert Morris University, as well as Duquesne University and Chatham University.  *See* Univ. of Pittsburgh, Health Insurance & Fees (Ex. P to Kcehowski Decl.); Duquesne Univ., UPMC Health Plan (Ex. Q to Kcehowski Decl.); Robert Morris Univ., Student Health Insurance (Ex. R to Kcehowski Decl.); Chatham Univ.,

Health Insurance Requirement (Ex. S to Kcehowski Decl.).  These plans offer in-network access

to UPMC Providers, many of which are located near each of those schools.

78.     UPMC has also partnered with St. Francis University to provide its students with

telemedicine services for acute illness and injury.  *See* St. Francis Univ., MyHealth@School at

Saint Francis (Ex. T to Kcehowski Decl.).

78.     The general legal presumption is that many of these students are *not* citizens of

Pennsylvania.  *See Doe v. Schwerzler*, 2007 WL 1892403, at *2 (D.N.J. June 28, 2007) ("'It is

generally presumed that a student who attends a university in a state other than the student's

'home' state intends to return 'home' upon completion of studies.'" (citation omitted)).

79.     And as a matter of fact, many are not.  "Pittsburgh campus students come from 50

states, three territories, the District of Columbia, and 108 countries."  *See* Univ. of Pittsburgh,

Admissions & Financial Aid, Class Profile (Ex. U to Kcehowski Decl.).  And according to the

University Times, the faculty and student newspaper, when the class of 2018 matriculated, 34

percent of students were from out of state, and 108 students were international.  *See* Class of

2018: Who are they?, UNIVERSITY TIMES, Sept. 25, 2014 (Ex. V to Kcehowski Decl.).  Some of

those students will return to their home States for employment.

80.     Many students will seek further education at schools in other States, also meaning

they are not citizens of Pennsylvania, even though they reside here.  *See Doe v. Schwerzler*, 2007

WL 1892403, at *2.  According to the University of Pittsburgh Career Center's Post-Graduation

Placement Data Reports, for the Class of 2018, 24 percent of survey respondents indicated that

they will continue with their educations after graduation.  *See* Univ. of Pittsburgh Career Center,

Post-Graduation Placement Data Reports (Ex. W to Kcehowski Decl.).  The schools they

planned to attend were in places like Michigan, New York, Massachusetts, Virginia, California, Maryland, North Carolina, and West Virginia. *See id*.

81.     Students at local schools such as the University of Pittsburgh, Duquesne University, and Robert Morris University are from states other than Pennsylvania or countries other than the United States; reside in Pennsylvania for school; have received healthcare from UPMC Providers while in Pennsylvania; have signed up for MyUPMC; and have visited the UPMC Websites.  In some cases, these students are here on a visa and are presently not allowed to remain permanently in Pennsylvania as a matter of law.  These individuals are therefore members of the putative class but citizens of other States or of foreign states.

82.     Based on these individuals alone, minimal diversity exists under CAFA.

83.     As another example, UPMC Providers deliver healthcare services to members of the military and are contracted in-network providers for TRICARE Network, a health insurance network specifically for active duty members of the armed forces and their dependents, as well as reservists, retirees, and others.  *See* TRICARE for New Active Duty Service Members (Ex. X to Kcehowski Decl.); Partial List of UPMC TRICARE Providers (Ex. Y to Kcehowski Decl.).

84.     Some of these individuals likely have a residence in Pennsylvania and have presumably visited a UPMC Website.  But many also are presumed *not* to be citizens of Pennsylvania.  The "domicile of a serviceman at the time of enlistment is presumed not to change, and evidence of an intention to change must be clear and unequivocal." *Harris v. Kellogg*, 151 F. Supp. 3d 600, 614 (W.D. Pa. 2015) (marks and citation omitted).

85.     Thus, as with UPMC's student patient population, military members who are patients at UPMC and who have visited the UPMC patient portals are likely to be domiciled in any of the 49 other States.

86.     Other categories of UPMC patients also cannot presumed to be Pennsylvania

citizens.  These include retirees who maintain a residence in Pennsylvania, but who spend a

substantial part of each year at a residence in another state, and neither vote, pay taxes, or intend

to permanently stay in Pennsylvania; and employees of out-of-state companies who currently

reside in Pennsylvania, but intend to return to their home state.

87.     This understanding of the patient population for UPMC Providers establishes

diversity jurisdiction under CAFA in a putative class comprised of Pennsylvania residents.  *See,

e.g.*, *Schwartz*, 2006 WL 487915, at \*5.  In *Schwartz*, the plaintiff sought recovery for

defendant's alleged failure to provide high-speed internet service and purported to represent "all

persons and entities residing or doing business in" Pennsylvania.  After the defendant removed

pursuant to CAFA, the court denied a motion to remand because:

> Hypothetically speaking, there may be numerous members of the
> proposed class who are citizens of different states but who resided
> or did business in Pennsylvania and subscribed to Comcast's high-
> speed internet service during the relevant time period…. One need
> only look at the hundreds of thousands of out of state students at
> Pennsylvania's colleges and universities who maintain internet
> service (as well as other necessary services) over the course of four
> years but only intend to remain in Pennsylvania during the period of
> their education.

*Schwartz*, 2006 WL 487915, at \*\*3, 5.

88.     The court also rejected any argument in favor of remand to the extent it was

"premised on the assumption that residence is an effective proxy for domicile."  *Id.* at \*6; *see

also, e.g.*, *id*. at \*5 ("An intent to maintain internet service does not suggest an intent to remain

permanently in one state.").

89.     The Third Circuit later agreed with the assertion of federal jurisdiction.  *See

Schwartz v. Comcast Corp.*, 256 F. App'x 515, 517 n.1 (3d Cir. 2007) ("We conclude that the

District Court properly exercised jurisdiction."); *see also Ellithy*, 2013 WL 3480206, at \*3

(denying remand where one former student fell within the putative class but was diverse from

defendant).

90.     So too, the circumstances here establish the diversity necessary for CAFA

removal because, by a preponderance of the evidence, at least one class member is not a citizen

of Pennsylvania.  *See* 28 U.S.C. § 1332(d)(2)(A).

**B.     The Purported Class Consists of More Than 100 Members.**

91.     UPMC does not believe that Plaintiffs have defined a proper class or that a class

can be maintained, and asserts that it is an individualized inquiry as to whether any current or

former patient falls within the proposed class definition or is entitled to relief.  However, the

class as proposed meets CAFA's threshold of at least 100 putative class members.  *See* 28 U.S.C.

§ 1332(d)(5)(B); *see also* Scott Decl. ¶ 7.

92.     The Complaint avers that the putative class is "so numerous that joinder of all

Class members is impracticable" and that "[t]his action is properly maintainable as a class

action."  Ex. 1.A ¶¶ 369-70.  The Complaint also alleges, correctly, that UPMC Providers own

and operate "multiple health care properties throughout Pennsylvania."  *Id*. ¶ 17.

93.     As noted *supra*, UPMC Providers operate hundreds of clinical locations and

receive over 7 million patient visits each year.

94.     If only .0015 percent of those 7 million visits last year were from unique

Pennsylvania residents who had visited a UPMC Website, CAFA's requirement of a 100-person

putative class would be met.  Federal jurisdiction is thus consistent with 28 U.S.C.

§ 1332(d)(5)(B).  Moreover, Plaintiffs have not established that the putative class meets any of

the exceptions to CAFA jurisdiction.  *See* 28 U.S.C. §§ 1332(d)(3)-(4).

**C.    The Complaint Places in Controversy A Sum Greater than $5 Million**

95.    Although UPMC concedes neither liability on Plaintiffs' claims nor the propriety of the relief they seek, and reserves all rights with respect to the defense of any alleged damages claim or impact to the class at all, the Complaint on its face also satisfies CAFA's amount-in-controversy element.  *See* 28 U.S.C. § 1332(d)(2).

96.    "[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold."  *Dart*, 574 U.S. at 89.  Where, as here, a complaint does not specify an amount sought, "the defendant's amount-in-controversy allegation should be accepted."  *Id.* at 87.  For purposes of assessing the jurisdictional amount, what matters is the amount put in controversy by the Complaint, not whether the Plaintiffs' claims are meritorious.

97.    Plaintiffs have not limited their alleged damages to less than the jurisdictional threshold of $5 million.  As a result, "[i]t must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal."  *Auto–Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 395 (3d Cir. 2016) (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288–89 (1938)); *see also Frederico v. Home Depot*, 507 F.3d 188, 194–99 (3d Cir. 2007).

98.    The Complaint seeks three separate (and cumulative) types of statutory damages: up to $1,000 per violation of the Pennsylvania Wiretapping and Electronic Surveillance Control Act (*see* Count II), up to $100 per violation of the Pennsylvania Unfair Trade and Business Practices Act (*see* Count III), and up to $600 per violation of the Pennsylvania Identity Theft Statute (*see* Count IV).  In total, Plaintiffs allege that each putative class member is potentially entitled to $1,600 in statutory damages alone.  *See* Ex. 1.A, Prayer for Relief, §§ b, c, and d.

99.     Assuming just a few thousand web visitors, the statutory damages alone could meet the $5 million threshold.  Notably, that math does not include Plaintiffs' request for the "reasonably royalty" payment, a constructive trust through which to compensate plaintiffs, nominal damages, the value of the plaintiffs' data, attorneys' fees, and punitive damages, all of which are appropriately considered in determining the amount in controversy.  *See* Prayer for Relief, §§ e, f, g, h, i, and j; *see also Frederico*, 507 F.3d at 197 ("Plaintiff also seeks attorneys' fees, which can exceed six figures in a class action and are properly aggregated and considered for purposes of determining the amount in controversy under CAFA."); *id.* at 198–99 (punitive damages); *id.* at 197–98 (compensatory damages).

100.    This is sufficient for removal.  "[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart*, 574 U.S. at 89.  CAFA "tells the District Court to determine whether it has jurisdiction by adding up the value of the claim of each person who falls within the definition of [the] proposed class and determine whether the resulting sum exceeds $5 million." *Standard Fire Ins. Co. v. Knowles*, 568 U.S 588, 592 (2013).  This calculation can be based on adding the value of a plaintiff's legal claims.  *See, e.g.*, *Truglio v. Planet Fitness, Inc.*, 2017 WL 3595475, at *3 (D.N.J. Aug. 21, 2017) ("The Court finds that Defendants have established, by a preponderance of the evidence, that CAFA's amount-in-controversy requirement is met because, based on the combined membership number of 133,318 …, an award of $100 in statutory damages to each class member would result in an aggregate award of more than $13 million, exceeding CAFA's $5 million threshold."); *cf. Auto–Owners Ins. Co.*, 835 F.3d at 396 (trebled $1,500 statutory damages for willful violation of the TCPA multiplied by the number of violations was appropriate calculation to arrive at an amount in controversy for assessing diversity jurisdiction).

101.    Accordingly, UPMC meets all requirements for removal under CAFA, and this Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(d).

## COMPLIANCE WITH PROCEDURAL REQUIREMENTS

102.    UPMC has satisfied all the procedural requirements for removal under 28 U.S.C. § 1446.

103.    UPMC files this Notice of Removal pursuant to 28 U.S.C. § 1441(a) in the United States District Court for the Western District of Pennsylvania, because the State court in which the action is pending, the Court of Common Pleas for Allegheny County, is within this federal judicial district.  This Notice is signed pursuant to Rule 11 of the Federal Rules of Civil Procedure.

104.    Plaintiffs served the Complaint on UPMC on or after February 20, 2020.  UPMC removed the case within 30 days of that date; therefore, this removal is timely under 28 U.S.C. § 1446(b).  *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354-56 (1999).

105.    A copy of "all process, pleadings, orders, and other documents then on file in the State Court," are attached hereto as Exhibit 1 in accordance with 28 U.S.C. § 1446(a).

106.    In accordance with 28 U.S.C. § 1446(d), promptly after filing this Notice, UPMC will "give written notice thereof to all adverse parties," and will "file a copy of the notice with the clerk" of the Court of Common Pleas of Allegheny County.  A true and correct copy of the Notice to Plaintiff and Notice to the State Court of Filing of Notice of Removal will be filed as separate documents.

107.    Nothing in this Notice of Removal shall be interpreted as a waiver or relinquishment of UPMC's right to assert any and all defenses or objections to the Complaint, including but not limited to Plaintiffs' class allegations.

108.   If there are any questions that arise as to the propriety of removal of this action, UPMC respectfully requests the opportunity to submit briefing, argument, and additional evidence as necessary to support removal of this case.

Dated: March 12, 2020

Respectfully submitted,

 /s/ *Rebekah B. Kcehowski*
Leon F. DeJulius, Jr. (Pa. 90383)
Rebekah B. Kcehowski (Pa. 90219)
Anderson T. Bailey (Pa. 206485)
JONES DAY
500 Grant St., Suite 4500
Pittsburgh, PA 15219
Ph: (412) 391-3939
Fx: (412) 394-7959
lfdejulius@jonesday.com
rbkcehowski@jonesday.com
atbailey@jonesday.com

*Counsel for UPMC*

## CERTIFICATE OF SERVICE

I hereby certify that this 12th day of March, 2020, I served a copy of the foregoing Notice

of Removal, together with all exhibits thereto, on the following counsel via the method indicated:

Jay Barnes
SIMMONS HANLY CONROY
One Court Street
Alton, IL 62002
Telephone: 618.259.2222
jaybarnes@simmonsfirm.com
*Via electronic mail and first class*
*U.S mail, postage prepaid*

Amy Gunn
Elizabeth Lenivy
THE SIMON LAW FIRM, P.C.
800 Market Street, Suite 1700
St. Louis, MO 63101
Telephone: 314.241.2929
agunn@simonlawpc.com
elenivy@smonlawpc.com
*Via electronic mail and first class*
*U.S mail, postage prepaid*

James C. Shah
Nathan Zipperian
Michael Ols
SHEPHERD, FINKELMAN, MILLER & SHAH,
LLP
1845 Walnut Street, Suite 806
806 Philadelphia, PA
Telephone: 610.891.9980
Facsimile: 866.300.7397
jshaw@sfmslaw.com
nzipperian@sfmslaw.com
mols@sfmslaw.com
*Via electronic mail and first class*
*U.S mail, postage prepaid*

Mitchell Breit
An Truong
SIMMONS HANLY CONROY
112 Madison Avenue
New York, NY 10016-7416
Telephone: 212.784.6400
Facsimile: 212.213.5949
mbreit@simmonsfirm.com
atruong@simmonsfirm.com
*Via electronic mail*

  /s/ *Rebekah B. Kcehowski*
Rebekah B. Kcehowski
*Counsel for UPMC*