# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JANE DOE I and JANE DOE II, on behalf of themselves and all others similarly situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> UPMC, a Pennsylvania Nonprofit, Non-Stock Corporation, <br><br> *Defendant*. | Case No. 2:20-cv-00359-MJH <br><br> Hon. Marilyn J. Horan <br><br> Electronically Filed |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO REMAND

## **TABLE OF CONTENTS**

TABLE OF AUTHORTIES ................................................................................ iv

INTRODUCTION ...........................................................................................1

ARGUMENT ..................................................................................................1

I.  CAFA JURISDICTION IS NOT PRESENT ..............................................1

   A.  UPMC HAS NOT MET ITS THRESHOLD BURDEN UNDER CAFA .........................2

   B.  THIS MATTER IS EXCLUDED FROM CAFA JURISDICTION ..................................2

      1.  The "Home State" Exception Requires Remand ..........................................2

         a.  Plaintiffs need only prove class citizenship by a preponderance of the evidence ..........................................................................................3

         b.  Residency creates a rebuttable presumption of citizenship for purposes of proving CAFA's exceptions ..........................................................4

         c.  Official U.S. Census data demonstrates that two-thirds of Plaintiffs' class members are Pennsylvania citizens ..........................................5

         d.  Plaintiffs request leave to conduct jurisdictional discovery ..................................7

II.  UPMC'S FEDERAL OFFICER INTERPRETATION WOULD CREATE GRAVE CONSTITUTIONAL CONCERNS AND IS NOT SUPPORTED BY THE REGULATORY SCHEME ON WHICH IT RELIES .............................................7

   A.  UPMC'S FEDERAL OFFICER ARGUMENT CREATES CONSTITUTIONAL CONCERNS THAT THIS COURT SHOULD AVOID ....................................................7

   B.  UPMC IS NEITHER A FEDERAL OFFICER, NOR ACTING AT THE DIRECTION OF A FEDERAL OFFICER, WHEN IT VIOLATES PATIENT PRIVACY ...................................................................................................8

      1.  UPMC Is Not Acting Under a Federal Officer when it Discloses Patient Personally Identifiable Information and Communications to Third Parties for Marketing Purposes ..........................................................................9

         a.  No federal officer or agency directed UPMC to disclose patient personally identifiable information and communications third party marketing companies ......................................................................................10

         b.  UPMC implicitly concedes Plaintiffs' lawsuit is not targeted at its relationship with any federal officer ..........................................................12

         c.  The federal officers cited by UPMC have a duty to protect patient privacy, not compel disclosure of personally identifiable patient data to Facebook or Google ..........................................................................14

      d.   The provision of federally-subsidized healthcare to patients does not transform UPMC into a federal officer ................................................................17

      e.   UPMC's federal officer interpretation vastly expands its intent...........................17

2.  UMPC's Disclosures to Facebook, Google, and Other Marketing Firms Were Not "For or Relating to an Act Under Color of Federal Office" ...............................18

3.  UPMC Does Not Present Any "Colorable Federal Defense"....................................20

      a.   Whether the data is protected by HIPAA is not a defense ...................................20

      b.   Whether patient data is personally identifiable is a fact defense, not a federal defense .......................................................................................................21

      c.   The Ninth Circuit's decision in *Smith v. Facebook* is inapposite .........................21

      d.   HIPAA does not preempt state law privacy or contract claims ...........................22

      e.   The Dormant Commerce Clause does not apply because nothing about this case would regulate commerce "occurring wholly outside" Pennsylvania ..........23

      f.   *Buckman* does not apply because Plaintiffs have not made a fraud-on-the-federal-agency claim...........................................................................................23

      g.  Third Circuit law makes clear that this case is actionable under state law............24

CONCLUSION..................................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Anthony v. Small Tube Mfg. Corp.*,
   535 F. Supp. 2d 506 (E.D. Pa. 2007) ..........................................................................................1

*Buckman Co. v. Plaintiffs' Legal Comm.*,
   531 U.S. 341 (2001) ...................................................................................................................23

*County of Montgomery v. Atlantic Richfield Co.*,
   795 Fed. App'x 111 (3d Cir. 2020) ...........................................................................................18

*DeBartolo Corp. v. Florida Gulf Coast Bldg. and Const. Trades Council*,
   485 U.S. 568 (1988) .....................................................................................................................8

*Dist. of Columbia v. Murphy*,
   314 U.S. 441, 62 S.Ct. 303, 86 L.Ed. 329 (1941) .......................................................................4

*Doe v. Delie*,
   257 F.3d 309 (3d Cir. 2001).........................................................................................................8

*Doe v. Virgina Mason*,
   No. 19-2-26674-1 SEA (Jan. 31, 2020, Super. Ct. of Washington) ..........................................22

*Draper v. Ctr. for Organ Recovery & Educ.*,
   2010 WL 1444860 (W.D. Pa. Apr. 8, 2010) .............................................................................12

*Ellis v. Montgomery County*,
   267 F.Supp.3d 510 (E.D. Pa. 2017)....................................................................................3, 4, 6

*Franklin v. Sessions*,
   291 F.Supp.3d 705 (W.D. Pa. 2017)............................................................................................8

*Golden v. New Jersey Institute of Technology*,
   934 F.3d 302 (3d Cir. 2019)..................................................................................................9, 18

*Hagen v. Benjamin Foster Co.*,
   739 F.Supp.2d 770 (E.D. Pa. 2010)...........................................................................................20

*Healy v. Beer Inst.*,
   491 U.S. 324 (1989) ...................................................................................................................23

*In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Philadelphia*,
   790 F.3d 457 (3d Cir. 2015)...........................................................................................12, 13, 24

*In re Google Inc. Cookie Placement Consumer Privacy Litigation,*
  806 F.3d 125 (3d Cir. 2015)........................................................................................24

*In re Nickelodeon Consumer Privacy Litigation,*
  827 F.3d 262 (3d Cir. 2016)........................................................................................24

*Kaufman v. Allstate New Jersey Ins. Co.,*
  561 F.3d 144 (3rd Cir. 2009) ........................................................................................2

*Kennedy v. Health Options, Inc.,*
  329 F.Supp.2d 1314 (S.D. Fl. 2004) ..........................................................................17

*Krasnov [v. Dinan],*
  465 F.2d 1298 (3d Cir. 1972)........................................................................................4

*Mason v. Lockwood, Andrews & Newnam, P.C.,*
  842 F.3d (6th Cir. 2016)...............................................................................................4

*Mennonite Gen. Hosp., Inc. v. Molina Healthcare of P.R.,*
  319 F.Supp.3d 587 (D. P.R. 2018)..............................................................................17

*N.G. v. Downey Reg. Med. Ctr,*
  140 F.Supp.3d 1036 (C.D. Cal. 2015) ........................................................................17

*Papp v. Fore-Kast Sales Co., Inc.,*
  842 F.3d 805 (3d Cir. 2016)...........................................................................10, 13, 20

*Smith v. Facebook,*
  745 F.App'x 8 (9th Cir. 2018) ...............................................................................21, 22

*Veneruso v. Mount Vernon Neighborhood Health Center,*
  933 F.Supp.2d 613 (S.D. N.Y. 2013) .........................................................................17

*Vodenichar v. Halcon Energy Properties, Inc.,*
  733 F.3d 497 (3d Cir. 2013)....................................................................................2, 3

*Watson v. Phillip Morris Cos., Inc.,*
  551 U.S. 142 (2007) .............................................................................................*passim*

*Whalen v. Roe,*
  429 U.S. 589 (1977) ......................................................................................................8

*Whitman v. American Trucking Association,*
  531 U.S. 457 (2001) ....................................................................................................23

## Statutes

28 U.S.C. § 1332............................................................................................................*passim*

28 U.S.C. § 1332(d)(2)(a) ..................................................................................................1

28 U.S.C. § 1332(d)(4)(B) .................................................................................................2

28 U.S.C. § 1441(a) ...........................................................................................................1

28 U.S.C. § 1442(a)(1) .......................................................................................................9

CAFA Pub. L. 109-2, 119 Stat. 4 ......................................................................................2

## **Regulations**

42 C.F.R. § 495.24(c) .......................................................................................................12

42 C.F.R. § 495.24(e) .......................................................................................................12

42 C.F.R. § 495.24(e)(4) ...................................................................................................15

45 C.F.R. § 160.203 ..........................................................................................................22

45 C.F.R. § 160.203(b) .....................................................................................................23

45 C.F.R. § 164.510(1) .....................................................................................................17

45 C.F.R. § 164.510(2) .....................................................................................................17

65 FR 82717 (Dec. 28, 2000) ...........................................................................................16

67 FR 53186 (Aug. 14, 2002) ...........................................................................................16

75 FR 44368 (Jul. 28, 2010) .............................................................................................17

77 FR 54002 (Sept. 4, 2012) ..................................................................................15, 17, 24

78 FR 5642 (Jan. 25, 2013) ..............................................................................................16

83 FR 41665 (Aug. 17, 2018) ............................................................................ 12, 15, 16, 17

80 FR 62842 (Oct. 16, 2015) ...................................................................................11, 15, 17

83 FR 20164 (May 7, 2018) ..............................................................................................11

## INTRODUCTION

This case arises out of the disclosure by Defendant, UPMC ("Defendant" or "UPMC"), of patient personally identifiable data and communications to Facebook, Google, and dozens of other third-party marketing companies without patient knowledge or authorization. UPMC's unauthorized disclosures are funneled through invisible web-bugs that it surreptitiously deploys on its web-properties, including what it describes as "the digital front door to the UPMC health system."

Plaintiffs are Pennsylvania citizens who are patients of UPMC, a Pennsylvania hospital system, who bring Pennsylvania state-law claims on behalf of themselves and all other residents of Pennsylvania who were (and are) patients of UPMC and used UPMC web properties. Plaintiffs' claims arise out of UPMC's breach of its obligations to them under Pennsylvania state law, for actions that took place in the Commonwealth of Pennsylvania, and for which there are no federal defenses available.

On March 12, 2020, Defendant filed its Notice of Removal, asserting federal court jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332, and the federal officer removal statute in 28 U.S.C. § 1441(a). For the reasons stated in Plaintiffs' Motion to Remand and explained herein, this Court should remand the case back to Pennsylvania state court.

## ARGUMENT

### I.    CAFA JURISDICTION IS NOT PRESENT

CAFA permits removal to federal court of class actions filed in state court where the matter in controversy exceeds $5 million and "any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(a). "[T]he burden of establishing CAFA jurisdiction is on the party asserting jurisdiction." *Anthony v. Small Tube Mfg. Corp.*, 535 F. Supp. 2d 506, 513 (E.D. Pa. 2007).

### A.     UPMC HAS NOT MET ITS THRESHOLD BURDEN UNDER CAFA

Plaintiffs' alleged class consists of "all Pennsylvania residents who are, or were, patients of UMPC or any of its affiliates, and who used UPMC's web property, including, but not limited to UPMC.com and the Patient Portal at myupmc.upmc.com." UPMC "is a citizen" of Pennsylvania. Def. Notice of Removal ("DNR"), ¶ 71. In its Notice of Removal, UPMC claims that the putative class includes UPMC patients who are Pennsylvania residents (but not citizens), although it provides no evidence of any such patient. In the absence of any specific putative class member who creates CAFA diversity, this case should be remanded back to state court.

### B.     THIS MATTER IS EXCLUDED FROM CAFA JURISDICTION

Even if the Court ruled in favor of UPMC, the case is excluded from CAFA under two exceptions.  One purpose of CAFA is to provide for "federal court consideration of interstate cases of national importance under diversity jurisdiction." *Kaufman v. Allstate New Jersey Ins. Co.*, 561 F.3d 144, 149 (3rd Cir. 2009) (*quoting* CAFA § 2, Pub. L. 109-2, 119 Stat. 4). With that in mind, CAFA carves out two exceptions that require district courts to decline jurisdiction for matters of local import. *Kaufman*, 561 F.3d at 149. In this case, both the "home state" and "local controversy" exceptions mandate remand.

#### 1.     The "Home State" Exception Requires Remand

Under the "home state" exception, a district court *shall* decline jurisdiction where "two-thirds or more of the members of all proposed plaintiff classes in the aggregate and the primary defendants, are citizens of the State in which the action was originally filed." 28 U.S.C. § 1332(d)(4)(B). The party seeking to invoke the "home state" exception must: "(1) establish that the citizenship of the members of two-thirds or more of the putative class is the state in which the action was originally filed; (2) establish the citizenship of the defendants; (3) identify the primary defendants; and (4) demonstrate

that two-thirds or more of the members of the putative class are citizens of the same state as the primary defendants." *Vodenichar v. Halcon Energy Properties, Inc.*, 733 F.3d 497, 503-04 (3d Cir. 2013).

Here, UPMC is the *only* defendant in this case and "is incorporated, and maintains its headquarters and principal place of business, in Pennsylvania, and is a citizen of this Commonwealth." DNR, ¶ 71. Thus, the only issue in dispute is whether at least two-thirds of Plaintiffs' class are Pennsylvania citizens as well. While Plaintiffs are permitted to seek jurisdictional discovery regarding the evidentiary support, if any, for UPMC's factual assertions in its removal, data from the United States Census proves that it is more likely true than not that more than two-thirds of UPMC's patients who are residents of Pennsylvania are *also* citizens of Pennsylvania.

> a.      **Plaintiffs need only prove class citizenship by a preponderance of the evidence**

Plaintiffs, as the party seeking to invoke the "home state" exception, bear the burden of proving, by a preponderance of the evidence, that the exception applies. *Vodenichar v. Halcon Energy Properties, Inc.*, 733 F.3d 497, 503 (3rd Cir. 2013). Thus, Plaintiffs must "provide *evidence* (not merely assertions) that makes it more likely than not that more than two-thirds of the proposed class consists of citizens of the relevant state." *Ellis v. Montgomery County*, 267 F.Supp.3d 510, 516 (E.D. Pa. 2017) (emphasis in original). However, Plaintiffs need not prove the domicile for *every* class member, and the Court need only engage in a "practical and reasonable" inquiry:

> In weighing and considering the evidence submitted by a party seeking to invoke a CAFA exception, a court should engage in a "practical and reasonable" inquiry that considers the evidence in light of the context of the case. […] This pragmatic approach obviates the need to ascertain absolute proof of domicile for every class member, which would make the application of CAFA's citizenship requirements "unworkable" from a practical standpoint.

*Id.* (internal citations omitted).

### b.   Residency creates a rebuttable presumption of citizenship for purposes of proving CAFA's exceptions

Plaintiffs' putative class is confined to only "residents of Pennsylvania," and courts in the Third Circuit have started with the rebuttable presumption that residents are considered citizens for purposes of CAFA exceptions. *Id.* at 517-19. *Ellis* recognized this principle, noting "the Supreme Court's assertion that '[t]he place where a man lives is properly taken to be his domicile until facts adduced establish the contrary,' *Dist. of Columbia v. Murphy*, 314 U.S. 441, 455, 62 S.Ct. 303, 86 L.Ed. 329 (1941), which was cited by the Third Circuit to support the proposition that '[w]here one lives is prima facie evidence of domicile.' *Krasnov* [*v. Dinan*], 465 F.2d [1298,] 1300 [3d Cir. 1972) (citing *Murphy*, 314 U.S. 441, 62 S.Ct. 303).."

The *Ellis* court also looked to analysis provided by the Sixth Circuit, which concluded that "the circuits which have rejected a presumption or inference from residency to domicile have relied too directly on precedent developed in the context of diversity jurisdiction." *Id.* (citing *Mason v. Lockwood, Andrews & Newnam, P.C.*, 842 F.3d at 383, 391 (6th Cir. 2016). The court astutely recognized that the Sixth Circuit's approach comported with Third Circuit precedent, explaining:

> The Supreme Court held long ago that the presumption against federal jurisdiction carries more weight. *Robertson v. Cease*, 97 U.S. 646, 649, 24 L.Ed. 1057 (1878). This interaction between the presumptions is captured by the Third Circuit's statement in *Krasnov* that "[w]here one lives is prima facie evidence of domicile, but mere residency in a state is insufficient for purposes of *diversity*" […] The Sixth Circuit's analysis in *Mason* thus expands on the principle embedded within the Third Circuit's careful wording in *Krasnov*. The inadequacy of the residency-domicile presumption is unique to the context of diversity *jurisdiction.* And, as the Sixth Circuit noted, "[b]ecause the local controversy [and home state] exception[s] [are] not jurisdictional, the premise of *Robertson* [*v. Cease*] and its jurisdictional progeny is missing here." *Mason*, 842 F.3d at 393. The Third Circuit's narrow observation in *Krasnov* about the inadequacy of residency to establish diversity jurisdiction therefore does not control the CAFA exception analysis.

*Id.* at 518. *Ellis* thus concluded: "a class member's residency creates a rebuttable presumption of citizenship for the purposes of establishing the home state and local controversy exceptions to CAFA jurisdiction." *Id.* at 519.

Here, 100 percent of the putative class members are presumed to be citizens of Pennsylvania in the absence of any specific evidence to the contrary *from UPMC.*

> c.  **Official U.S. Census data demonstrates that two-thirds of Plaintiffs' class members are Pennsylvania citizens**

In its Notice of Removal ("DNR"), UPMC argued that there are four general categories of residents who could conceivably be non-citizen residents:

1. "students from colleges and university in Pennsylvania," DNR ¶¶ 76-81;
2. "members of the military," *id.* at ¶¶ 83-85;
3. "retirees who maintain a residence in Pennsylvania, but who spend a substantial portion of each year at a residence in another state," *id.* at ¶ 86; and
4. "employees of out-of-state companies who currently reside in Pennsylvania, but intend to return to their home state," *id.* at ¶ 86.

First, UPMC's categories are based on conjecture and inadmissible hearsay. *See* DNR ¶¶ 76-86, *citing* Exhibits P-Y.  In the absence of a specific evidentiary example, UPMC cannot rebut the presumption that these Pennsylvania residents are not also Pennsylvania citizens or establish that these categories combined make up more than one-third of the proposed class.

More importantly, Census data demonstrates that it is more likely true than not that more than two-thirds of the putative class are Pennsylvania citizens. According to the Census, there were 12.6 million civilian non-institutionalized residents of Pennsylvania in 2018. *See* Declaration of Jason 'Jay' Barnes in Support of Plaintiffs' Motion to Remand ("Barnes Decl.") at Exs. 1, 2. Even assuming that *all* college students and *all* military members in Pennsylvania are non-citizens (the two largest potential categories offered by UPMC), these groups comprise *less than nine percent* of Pennsylvania's population.

Service Members: According to the Census Bureau's 2018 American Community survey, Pennsylvania was the residence of 192,896 persons who possess TRICARE/military health coverage, representing an estimated 1.53 percent of the Pennsylvania total resident population.[1]

---

[1] Of those, just 112,526 are below the age of 65 – *i.e.* those likely to be in active-duty military service rather than retirees. Thus, the percentage of TRICARE/military health coverage residents more likely than not to fall in UPMC's "military" category is just 0.89 percent. *See id.*

<u>College Students:</u> According to the same survey, Pennsylvania was the residence for 807,852 undergraduate or graduate students, an estimated 6.5 percent of Pennsylvania's total resident population. *See* Barnes Decl. at Ex. 3.

<u>Retirees and Businesspersons</u>: Plaintiffs are not aware of any Census data to identify the number of retirees who are part-time residents of Pennsylvania who are not citizens, or to identify businesspersons currently residing in Pennsylvania but not citizens. Like its servicemember and college student categories, UPMC has offered no competent evidence to rebut the presumption that such individuals constitute a sufficient percent of putative class members necessary to permit CAFA jurisdiction - nor could it. Even if the Court reversed the presumption and *gave UPMC the presumption* that *all* students and *all* servicemembers who are residents of Pennsylvania are non-citizens, the combined percentage of putative class members in those categories is only 8.03 percent. This would mean that the remaining 25.3 percent of residents necessary for UPMC to prevail would have to be its theoretical "transient-retiree-that-summers-in-Pennsylvania" and "out-of-state-businessperson-who-does-not-reside-with-their-out-of-state-family" categories. The proposition that such individuals constitute over a quarter of UPMC's Pennsylvania resident patient population is simply absurd.

Plaintiffs' methodology for demonstrating citizenship need not be perfect.[2] *See Ellis*, 236 F.Supp.3d at 519-20. In *Ellis*, the defendants moved to remand a class action brought on behalf of individuals who had arrest records published on the internet. *Id.* at 512-13. The defendants conducted public records searches for each inmate with a last name beginning with "E" or "S," which demonstrated that about 90 percent of the "sample size" had a Pennsylvania address at the time they were booked. *Id.* The court noted that the defendants' evidence was "imperfect," but nonetheless sufficient in light of their burden:

---

[2] Nevertheless, even without the benefit of jurisdictional discovery, Plaintiffs submit more admissible, relevant evidence than UPMC.

> Defendants need not prove the citizenship of every member of the class with precision. *They must only show that it is more likely than not that more than two-thirds are citizens of Pennsylvania* … the most likely conclusion from Defendants' limited sample is that the proportion of class members still residing in Pennsylvania after their release from MCCF approximates the 91% share of MCCF inmates who reported a Pennsylvania address at their booking.

*Id.* at 519-20 (emphasis added). In holding that the "home state" exception applied, the court further noted that the plaintiffs offered no competing evidence to refute the defendants' limited sample. *Id.*

Ironically, here, UPMC's factually supported, best-case scenario is that 91 percent of the putative class members are Pennsylvania citizens. Thus, UPMC falls far short. In light of the Census data, it is more likely than not that two-thirds of UPMC's patients who are residents of Pennsylvania and used the UPMC web-properties to communicate with Defendant are correctly presumed to be citizens of Pennsylvania. Thus, the "home state" exception mandates remand.[3]

> d.      **Plaintiffs request leave to conduct jurisdictional discovery**

In the event that the Court does not deem the combination of the presumption of citizenship for residents and the Census data sufficient to establish the citizenship requirement for the "home state" or "local controversy" exceptions to CAFA, Plaintiffs respectfully request that the Court grant Plaintiffs leave to conduct jurisdictional discovery from UPMC regarding each of UPMC's identified categories of patients who are residents, but may not be citizens, of Pennsylvania.

## II.     UPMC'S FEDERAL OFFICER INTERPRETATION WOULD CREATE GRAVE CONSTITUTIONAL CONCERNS AND IS NOT SUPPORTED BY THE REGULATORY SCHEME ON WHICH IT RELIES

### A.      UPMC'S FEDERAL OFFICER ARGUMENT CREATES CONSTITUTIONAL CONCERNS THAT THIS COURT SHOULD AVOID

UPMC also invokes the federal officer removal statute in support of removal. DNR ¶¶ 7-65. Essentially, UPMC argues that it was compelled by federal agencies and officers to disclose personally identifiable patient data and communications to Facebook, Google, and various other third parties to satisfy what UPMC alleges was a federal duty. UPMC's argument must fail on its own merits for the

---

[3] Plaintiffs also satisfy the elements for remand under CAFA's "local controversy" exception.

reasons stated below, but the Court may not even need to reach the question under the doctrine of constitutional avoidance, which "requires courts to construe statutes, 'if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score.'" *Franklin v. Sessions*, 291 F.Supp.3d 705, 718 (W.D. Pa. 2017) (internal citations omitted). "[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems," courts will construe the statute to avoid such problems "unless such construction is plainly contrary to the intent [of the legislature.]" *DeBartolo Corp. v. Florida Gulf Coast Bldg. and Const. Trades Council*, 485 U.S. 568, 575 (1988).

The Third Circuit has "long recognized the right to privacy in one's medical information." *Doe v. Delie*, 257 F.3d 309, 315-16 (3d Cir. 2001). This right is part of a constitutional right to privacy which protects "the individual interest in avoiding disclosure of personal matters." *Whalen v. Roe*, 429 U.S. 589, 599 (1977). In *Delie*, the Third Circuit recognized the right for prisoners' medical information not to be disclosed without their consent. Under UPMC's interpretation of the various federal statutes, programs, and rules that it cites, the federal government is compelling or encouraging it to disclose its own patients' data to massive third-party advertising companies – including Facebook and Google. If UPMC were correct, such a federal scheme would raise grave constitutional issues about the agencies, officers, statutes, and rules that UPMC cites. To the extent there is any doubt about whether the federal government compelled UPMC to disclose patient data to Facebook, Google and other third parties the Court must avoid such an interpretation because it raises grave constitutional questions about those statutes, rules, and programs.

**B.      UPMC IS NEITHER A FEDERAL OFFICER, NOR ACTING AT THE DIRECTION OF A FEDERAL OFFICER, WHEN IT VIOLATES PATIENT PRIVACY**

The federal officer statute provides that a civil action may be removed to federal court where the action is "against or directed to … [t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office[.]" 28 U.S.C. § 1442(a)(1). A

party removing as a federal officer must prove: (1) that the defendant is a person within the meaning of the statute; (2) "the plaintiff's claims are based upon the defendant's conduct *acting under* the United States, it agencies, or its officers;" (3) "the plaintiff's claims against the defendant are *for, or relating to an act under color of federal office;*" and (4) "the defendant raises a *colorable federal defense* to the plaintiff's claims." *Golden v. New Jersey Institute of Technology*, 934 F.3d 302, 309 (3d Cir. 2019) (emphasis added). UPMC fails to satisfy the required second, third, and fourth elements.

*First*, UPMC is not acting under any federal agency or officer by disclosing personally identifiable patient data and communications to third party marketing companies without patient knowledge, consent, or authorization. UPMC's actions are neither directed nor permitted by any federal agency or officer. There is no statute or rule that requires UPMC's conduct. In fact, there is not even a statute or rule that requires a medical provider to have a website or patient portal. Moreover, Plaintiffs' claims are not directed at any relationship between UPMC and any federal agency or officer. A hospital, and any health care provider, can qualify for the voluntary programs cited by UPMC without a website or patient portal.

*Second*, Plaintiffs' claims are not for, or relating to, an act under color of federal office because the act in question, *i.e.* disclosure of personally identifiable patient data and communications to third party marketing companies, has no connection or association with any federal office.

*Third*, UPMC does not raise a single colorable federal defense and its defenses cannot be reasonably asserted based on the facts presented and current law. And, even if they could be reasonably asserted, they would not establish a complete defense to any of Plaintiffs' claims at trial.

      1.      **UPMC Is Not *Acting Under* a Federal Officer when it Discloses Patient Personally Identifiable Information and Communications to Third Parties for Marketing Purposes**

"[T]he fact that a regulatory agency directs, supervises, and monitor's a company's activities in considerable detail" does not make the company one acting under a federal officer. *Watson v. Phillip*

*Morris Cos., Inc.*, 551 U.S. 142, 145 (2007). Instead, for a private person, acting **under** refers to "a relationship that involves 'acting in a certain capacity, considered in relation to one holding a superior position or office." *Id.* at 151-52. An "acting under" relationship "typically involves 'subjection, guidance, or control'" and "must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior." *Id.* To satisfy the *acting under* element, Defendant must show either that the acts in question were "done *at **the specific behest*** of the federal officer or agency" or "that the allegations are **directed at** the relationship between the defendant and the federal officer or agency." *Papp v. Fore-Kast Sales Co., Inc.*, 842 F.3d 805, 812-13 (3d Cir. 2016) (emphasis added). Further, in *Watson*, the Supreme Court held that the statute applies "only if [the defendant was] 'authorized to act with or for federal officers or agents in affirmatively executing duties under federal law" and to private persons "who lawfully assist" the federal officer "in the performance of his official duty." *Watson*, 551 U.S. at 151.

Here, UPMC fails to show that it was acting at the behest of a federal officer or agency, and tacitly concedes that the case is not directed at its relationship with any federal officer or agency. Further, the federal "Meaningful Use" program identified by UPMC, as well and the authorities and regulations it relies upon conclusively establish that such disclosures were not only without authorization, but unlawful and contrary to its federal duty to protect patient privacy.

a.     **No federal officer or agency directed UPMC to disclose patient personally identifiable information and communications third party marketing companies**

UPMC's fails to identify any federal directive or duty to engage in the activities at the heart of this case: routine disclosures of patient personally identifiable information to third party marketing companies without authorization. Instead, UPMC relies on the federal government's general interest in improving health information technology. But UPMC's omissions in its discussion of the federal authorities cited in its Notice of Removal are shocking.

The "meaningful use" program is not mandatory, but voluntary and now called the Promoting Interoperability program.[4] UPMC is well aware of this. In 2018, UPMC opposed a proposal for a limited mandate on the use of EHRs in a separate federal program by arguing that even a limited mandate on the use of EHRs "could prove deadly and disastrous to Medicare and Medicaid beneficiaries across this nation." Barnes Decl. at Ex. 4 at 24-25, *UPMC Letter to CMS Commenting on Proposed Rule* (June 25, 2018). Consistent with UPMC's concern, nothing was mandated. In fact, neither a website nor patient portal are required for a provider to qualify under the voluntary Promoting Interoperability incentive program. *See* CMS, EHR Incentive Program Stage 3 Rule, 80 FR 62842 (Oct. 16, 2015) ("[N]ot only do we not require a 'patient portal' format …, we also do not advocate such a limit on innovation in software or systems designed to allow patients to access and engage with their health information."). Further, to qualify for the voluntary Promoting Interoperability incentives, hospitals are not required to demonstrate that a single patient actually used a patient portal. *See* 42 C.F.R. § 495.24(e). Until 2018, hospitals had only been required to show that a single patient used an EHR mechanism (but not necessarily a patient portal) to view, download, or transmit their health information. *See* 42 C.F.R. § 495.24(c). In 2018, CMS explained it dropped the single patient measure because it "detract[ed] from progress on the Interoperability Program's goals of focusing on patient care, interoperability, and leveraging advanced use of health IT." CMS, *Promoting Interoperability Final Rule*, 83 FR 41665 (Aug. 17, 2018).

In addition, as *Watson* made clear, being regulated alone is not sufficient to confer federal officer status – even regulation that is highly detailed, supervised, and monitored. "[T]o trigger the right to remove a case, the private entity must actually assist, or help to carry out, the duties of the

---

[4] CMS changed the name in 2018 to better reflect its focus on "interoperability," *i.e.* the ability of provider electronic health record systems to interact with each other, and "improving patient access to health information," which does not include any measure of actual patient use of EHRs. DHHS, CMS, *Proposed Promoting Interoperability Programs*, 83 FR 20164, 20516 (May 7, 2018).

federal supervisor." *Draper v. Ctr. for Organ Recovery & Educ.*, No. 2:10-CV-181, 2010 WL 1444860, at *4 (W.D. Pa. Apr. 8, 2010). Here, UPMC fails to explain how its participation in a voluntary federal program morphs it into a federal officer carrying out the duty of a federal supervisor.

> b.   **UPMC implicitly concedes Plaintiffs' lawsuit is not** *targeted at* **its relationship with any federal officer**

UPMC specifically points out that it does not show that its actions were "at the behest of a federal agency." DNR at 5, ¶ 12. Instead, UPMC cites Third Circuit case law permitting removal where the allegations of the underlying complaint are "directed at" the relationship between the defendant and the federal government. *Id.* at 5, ¶ 12. The Third Circuit has explained this is so because "acting under" describes "the triggering relationship between a private entity and a federal officer," and, where a case "targets" that relationship, removal is appropriate. *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457, 468, 470 (3d Cir. 2015).

UPMC then argues removal is appropriate because "[t]he allegations here squarely target the relationship between the UPMC Providers and the federal government." DNR at 5-6, ¶¶12-14, adopting language from *Def. Assoc. of Phila.*, 790 F.3d 457, 470 (3d Cir. 2015). UPMC concedes, however, that the allegations here "pertaining to the design and functionality of the UPMC Websites" only "*implicate* how UPMC Providers" execute the Meaningful Use program, meet federal health IT criteria, and qualify for federal payments." *Id* at ¶14. (emphasis added).

"Target" and "implicate" have different meanings. For this reason, the Third Circuit confined its holding to a narrow scope of actions that "target" and are "directed to" a relationship with a federal officer. UPMC, however, unilaterally expands on this narrow language considerably (and vaguely) to include any actions that "implicate" a relationship with a federal officer.  Yet the Third Circuit's "target" and "directed to" cases illustrate the intentional specificity of its terminology.

In *Defense Association*, the Commonwealth of Pennsylvania attempted to remove criminal defense attorneys from state court proceedings when those defenders were acting through a non-

profit public defender association as designated by the federal courts of Pennsylvania and "under the supervision of the Director of the Administrative Office of the United States Courts." *Def. Assoc. of Phila.*, 790 F.3d at 461-62. The Commonwealth argued in state court proceedings that these federal defenders should be precluded from representing defendants in Pennsylvania state courts in the absence of a specific order from a federal official, and that their presence was illegal and "violat[ed] the sovereignty of the Commonwealth of Pennsylvania." *Id.* at 464. The Third Circuit explained that removal was appropriate for underlying litigation that targets the relationship between the proponent of removal and the federal government because the defense "attorneys' employment with the Federal Community Defender" was "the very basis of the Commonwealth's decision to wage the[] disqualification proceedings against them." *Id.* at 472. The underlying motions attempted to litigate "whether the Federal Community Defender is violating the federal authority granted to it." *Id.*

Similarly, in *Papp v. Fore-Kast Sales Co., Inc.*, 842 F.3d 805 (3d Cir. 2016), the underlying action was based on the defendant's claim against Boeing for failure to warn about asbestos risks in an airplane manufactured solely *for the federal government* and *at the military's specific direction.*

This case is far different. Here, Plaintiffs' do not "target" the relationship between UPMC and the federal government in any sense. The Complaint makes no mention of the Promoting Interoperability program and is not directed at UPMC's general maintenance of a website or online patient portal (neither of which are mandated by federal government, and neither of which are required to qualify for incentive payments). Instead, Plaintiffs' action is based on UPMC's surreptitious disclosure of personally identifiable patient data and communications to third-party marketing companies through invisible web-bugs that are not necessary for the website or online patient portal to function. These invisible web-bugs are not required by any federal overseer, and, in fact, as used by UPMC, are expressly forbidden by state and federal common law, statutes, and administrative rules.

As explained below, UPMC is wholly capable of meeting the incentives without engaging such tools, and, in fact, is prohibited from using such tools by the very regulations of the program.

> ### c.   The federal officers cited by UPMC have a duty to protect patient privacy, not compel disclosure of personally identifiable patient data to Facebook or Google

Federal officer removal only applies to private persons who are "authorized" to act with or for federal officers or agents in affirmatively executing duties under federal law and where they "lawfully assist" the federal officer in the performance of an official duty. *Watson*, 551 U.S. at 151. Thus, to meet this standard, a private person must show that the actions in question were authorized by federal officers in the execution of duties and that the actions were lawful. UPMC fails to do either.

*First*, UPMC's disclosures of patient personally identifiable data to Facebook, Google, and other third-party marketing companies without patient authorization is not authorized by federal law. No federal statute, rule, or regulation exists that authorizes a hospital to disclose such data, and UPMC fails to identity any federal officer or authority that authorizes it to disclose a list of its patients to any third party for marketing purposes in the absence of patient knowledge and express authorization.

*Second*, no federal agency or officer has any duty to use Facebook, Google, or any other third-party marketing tools. In support of its motion, UPMC points to the Office of the National Coordinator for Health Information Technology ("ONC"), the HITECH Act, and the incentives put in place by the Center for Medicare and Medicaid Services ("CMS") through a voluntary federal program that is now known as "Promoting Interoperability" and is focused on encouraging providers to adopted Certified Electronic Health Record Technology ("CEHRT") that is interoperable with the technology used by other providers and made available to patients, if they choose to take advantage of it. These federal agencies, officers, statutes, rules, and authorities do not impose a duty on anyone to disclose data to Facebook, Google, or any other marketing company.

To the contrary, the federal authorities cited by UPMC impose the opposite duty: to protect patient privacy. "Protecting patients' privacy and securing their health information stored in an EHR is a core requirement of the Medicare and Medicaid EHR Incentive Programs." ONC, *Guide to Privacy and Security of Electronic Health Information* at 9, Barnes Decl. at Ex. 5. Accordingly, the first requirement of Promoting Interoperability incentives is to "protect patient health information." 42 C.F.R. § 495.24(e)(4). CMS has repeatedly explained protecting patient privacy is "Objective 1" because:

> Protecting electronic health information is essential to all other aspects of meaningful use. Unintended and/or unlawful disclosures of personal health information could diminish consumers' confidence in EHRs and electronic health information exchange. Ensuring that health information is adequately protected and secured will assist in addressing the unique risks and challenges that may be presented by electronic health records.

CMS, *Stage 2 Final Rulemaking*, 77 FR 54002 (Sept. 4, 2012); *see also Stages 2 and 3 Final Rulemaking*, 80 FR 62793 (Oct. 16, 2015); *Promoting Interoperability Final Rulemaking*, 83 FR 41640 (Aug. 17, 2018). At the same time, CMS has explained that "the security of the transmission [of communications between patient and provider are] of paramount importance to CMS. … [A]ny transmission method chosen by a provider must comply with the privacy and security protocols for ePHI outlined in HIPAA." CMS, *Stages 2 and 3 Final Rulemaking*, 80 FR 62859 (Oct. 16, 2015).

Thus, rather than impose a duty on hospitals to share patient data with Facebook in connection with the creation of patient portals, the federal authorities cited by UPMC have consistently imposed the opposite duty on UPMC-- even UPMC's exhibits demonstrate this. For example, the ONC Federal Health IT Strategic Plan submitted by UPMC affirmatively states that it is "HHS' policy that the privacy and security of individually identifiable health information should be protected wherever it is electronically transmitted, maintained, or received." Dkt. 1-3, UPMC Ex. 2C at 30. The current ONC Federal Health IT strategic plan states, "Federal policies and activities support the accessibility and use of electronic health information by individuals … across products and organizations, in a timely and reliable way that protects personal privacy[.]" Barnes Decl., Ex. 6 at 8.

Ironically, UPMC points to the HITECH Act as a source for a federal duty to encourage providers to share patient data with Facebook and Google for marketing purposes and to increase participation in online patient portals. The HITECH Act did several things: (a) it put the ONC into statute; (b) it created what is now known as the Promoting Interoperability program; and (c) it strengthened federal prohibitions on the sale of patient data and the use of patient data for marketing purposes in the absence of specific, informed, written authorization. *See* HITECH Act, §§ 1304-1306. See Plaintiffs' Motion for Remand, Section IV for a more thorough list of privacy duties and rules set forth by the federal authorities cited by UPMC.  But the HITECH Act ***did not*** encourage or authorize the secret disclosure of patient information to Facebook and Google.

*Third*, UPMC's disclosures to Facebook, Google, and others are not lawful.[5] The disclosures violate Pennsylvania state law and there is nothing in Promoting Interoperability, HIPAA, or anywhere else that pre-empts Pennsylvania's common law privacy rules and the other statutes invoked in Plaintiffs' Complaint – particularly those that are more protective of privacy than HIPAA. To suggest otherwise (as UPMC does) conflicts with the express language of HIPAA. Just as important, CMS has

---

[5] In addition to violating Pennsylvania state law, UPMC's actions violate HIPAA. "the sale of a patient list to a marketing firm" is not permitted under HIPAA, and that "a covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which would include disclosure of mere patient status through a patient list. 65 FR 82717 (Dec. 28, 2000); 67 FR 53186 (Aug. 14, 2002). In 2013, after the HITECH Act was passed to strengthen HIPAA, the Department of Health and Human Services ("DHHS") explained that it would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 FR 5642 (Jan. 25, 2013). Further, guidance documents from DHHS state that "an indication that [an] individual was treated at a certain clinic" is a HIPAA violation, and that "covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list." The only relevant exception for identifying a patient's status without express written authorization is to "maintain a directory of individual's in its facility" that includes name, location, general condition that does not include medical information, and religious affiliation when used or disclose to "members of the clergy" or "other persons who ask for the individual by name." 45 C.F.R. § 164.510(1). Even then, patients must be provided an opportunity to object. 45 C.F.R. § 164.510(2).

CMS has repeatedly explained that Promoting Interoperability does not impact HIPAA. *Stage 1 Final Rule*, 75 FR 44368 (Jul. 28, 2010) ("[C]ompliance with HIPAA privacy and security rules is required for all covered entities, regardless of whether or not they participate in the EHR incentive programs."); *Stage 2 Final Rule*, 77 FR 53998 (Sept. 4, 2012) ("Providers must continue to comply with all applicable requirements under the HIPAA Privacy Rule[.]); *Stages 2 and 3 Final Rule*, 80 FR 62832 (Oct. 16, 2015) ("Providers must continue to comply with all applicable requirements under the HIPAA Privacy Rule."); *Promoting Interoperability Final Rule*, 83 FR 41662 (Aug. 17, 2018) (referring providers to HHS Office of Civil Rights for more information on HIPAA compliance.)

expressly stated, "No requirement of meaningful use supersedes any Federal, State, or local law regarding the privacy of a person's health information." CMS, *Meaningful Use Stage 2 Final Rulemaking*, 77 FR 54008 (Sept. 4, 2012).

> **d.** **The provision of federally-subsidized healthcare to patients does not transform UPMC into a federal officer**

UPMC also argues that it is a federal officer because its providers "contract[s] with the government" and "provide[s] care for thousands of federally-subsidized patients every day." DNR at 6, ¶ 14. These two facts are not relevant. A grocer who accepts food stamps is not a federal officer in a breach of privacy or tort case by a shopper. The same is true here. The existence of a government contract and provision of care to federally-subsidized patients via Medicare, Medicaid, or any other program does not transform UPMC into a federal officer. *N.G. v. Downey Reg. Med. Ctr*, 140 F.Supp.3d 1036 (C.D. Cal. 2015); *Kennedy v. Health Options, Inc.*, 329 F.Supp.2d 1314 (S.D. Fl. 2004); *Mennonite Gen. Hosp., Inc. v. Molina Healthcare of P.R.*, 319 F.Supp.3d 587 (D. P.R. 2018); *Veneruso v. Mount Vernon Neighborhood Health Center*, 933 F.Supp.2d 613 (S.D. N.Y. 2013).

> **e.** **UPMC's federal officer interpretation vastly expands its intent**

In *Watson*, the Supreme Court explained that the "broad language" of the removal statute "is not limitless ... a liberal construction nonetheless can find limits in a text's language, context, history, and purposes." 551 U.S. at 147. The Court explained there is no "basis for removal in the fact of federal regulation alone." *Id.* at 153. Nor, it said, was "compliance (or noncompliance) with federal laws, rules, and regulation" enough "by itself [to] fall within the scope of the statutory phrase 'acting under' a federal 'official'" – "even if the regulation is highly detailed and even if the private firm's activities are highly supervised and highly monitored." *Id.* To explain why, *Watson* looked to the language, history, and purpose of federal officer removal, explaining that the Act's "'basic' purpose is to protect the Federal Government from the interference with its 'operations' that would ensue were a State able, for example, to 'arrest' and bring 'to trial in a State court for an alleged offense against

the law of the State,' 'officers and agents' of the Federal Government 'acting … within the scope of their authority.'" *Id.* at 150. Other purposes include guarding against "local prejudice against unpopular federal laws or federal officials," state hostility to the enforcement of federal law, or state deprivation of a federal forum in which a federal official might assert a federal immunity defense. *Id.*

*Watson* explains that "[s]ome of these same considerations may apply" when a "private person acts as an assistant to a federal official in helping that official to enforce federal law." *Id.* at 151. But none were present in *Watson* – and none are present here. There is no threat that state court litigation in this case will interfere with government operations. Nor is Pennsylvania hostile to any federal officer or law. Finally, there is no "federal immunity" defense available to UPMC in this case. *Watson* explained that holding that federal immunity applied in that case "would expand the scope of the statute considerably" and there was nothing in the "language, nor history, nor purpose" of the Act leading it to believe that "Congress intended such expansion." *Id.* at 153. The same is true here. This Court should reject UPMC's federal officer claim.

### 2.    UMPC's Disclosures to Facebook, Google, and Other Marketing Firms Were Not "For or Relating to an Act Under Color of Federal Office"

The "color of federal office" element requires that there is a "connection' or 'association'" between the act in question and the federal office." *Golden*, 934 F.3d at 310. In *County of Montgomery v. Atlantic Richfield Co.*, 795 Fed. App'x 111 (3d Cir. 2020) (unreported),[6] the Third Circuit held that a lead paint manufacturer's allegation that it had created the offensive paint pursuant to specific federal requirements was not enough to satisfy the "connection" or "association" to the underlying action – a state law public nuisance case based on the manufacturer's contribution to the presence of lead paint throughout the counties' housing stock.

---

[6] Notably, UPMC's counsel represented the party that unsuccessfully invoked the federal officer removal statute.

Here, the acts in question are UPMC's unauthorized disclosures of personally identifiable patient data and communications to third parties for marketing purposes. There is even less of a connection between federal requirements and UPMC's actions than was deemed insufficient in *County of Montgomery* because UPMC's actions are wholly divorced from any requirements or incentives by any federal office and are in violation of those federal officers' express duties to protect patient privacy.

A general goal of the federal government to encourage interoperability of electronic health records and patient access to them does not translate into a duty to achieve that goal at the cost of violating other federal statutes or rules – or state law. None of the federal authorities cited by UPMC require or even encourage the deployment of surreptitious web-bugs to disclose personally identifiable patient data and communications to massive third-party marketing firms. To the extent the federal authorities cited by UPMC encourage providers to engage with patients, its recommendations can be found in UPMC Exhibit 2H, which advises providers, "Patients are likely to use a portal when it is recommended by their providers and has functionality that supports patient activation." If their doctor tells them to do it, and it is easy to set up, the patient is far more likely to engage with the portal than if they are stalked by UPMC ads as they traverse the Internet. Similarly, UPMC Exhibit 2J lists the ways in which providers are encouraged to meet the Promoting Interoperability Incentives:

> The whole staff should be involved in promoting the patient portal. The front office can display signs or posters, staff can distribute information brochures, and providers can include standard talking points to introduce the portal during patient visits.
>
> *CONSIDER: Patients are more likely to adopt and use a patient portal if their providers recommend and support portal use.*
>
> To simplify the portal registration process, have staff assist patients with the process, and consider providing a registration kiosk in the office. Staff can education patients about how to use the portal's features, and can offer guidance about the kinds of communication that are appropriate between providers and patients.[7]

---

[7] Dkt. 1-3, UPMC, Ex. 2J at 2-3.

If a grocery store failed to adequately secure shopper transaction and credit/debit care data, it could not remove the case to federal court by claiming federal officer statute because it used the same machines to process food stamp EBT cards. The grocer's failure to adequately protect its customers' sensitive data would not be for or relating to the food stamp program – even though the actions arose out of the same machinery. The same is true here. The fact that UPMC maintains electronic health records does not mean it is a federal officer. The personally identifiable and surreptitious third-party marketing tools deployed by UPMC to disclose patient data and communications to Facebook, Google, and other third parties are in no way connected or associated with any duties of the federal agencies and officers cited by UPMC. As a result, UPMC's federal officer removal argument fails.

### 3.     UPMC Does Not Present Any "Colorable Federal Defense"

For removal, a defendant must also present a "colorable federal defense" to the action, *i.e.* one that is "legitimate and [can] be reasonably asserted, given the facts presented and the current law" such that they "would establish a complete defense at trial." *Papp*, 842 F.3d at 815 (citing *Hagen v. Benjamin Foster Co.*, 739 F.Supp.2d 770, 782-83 (E.D. Pa. 2010)). Here, UPMC has not failed to present a legitimate or complete federal defense.

#### a.     Whether the data is protected by HIPAA is not a defense

UPMC first argues that its position regarding whether the disclosed data is subject to HIPAA constitutes a colorable federal defense. Besides being wrong about HIPAA, this is not a defense at all – much less a complete one. Plaintiffs' underlying Complaint alleges at least 11 sources of UPMC's duty of confidentiality for patient data and communications, of which HIPAA is only one. Whether UPMC complied with HIPAA is not a complete defense to any of Plaintiffs' Pennsylvania state law claims—and is likely not even a partial defense to any of them. Every claim is actionable regardless of whether the disclosures constitute a HIPAA violation. Even if one takes HIPAA off the list of sources of duty by UPMC, there remain at least ten other sources for which UPMC's violation gives rise to

the causes of action alleged in Plaintiffs' Complaint. Thus, HIPAA's applicability or lack thereof is no defense.

**b.      Whether patient data is personally identifiable is a fact defense, not a federal defense**

UPMC next argues that the case "concerns generic online information that is anonymous or linked only to a specific computer, not a person." DNR at 18, ¶59.  This is false. More importantly, and for purposes of this remand, it is a factual defense not a *federal* defense, as required for federal officer removal.

**c.      The Ninth Circuit's decision in *Smith v. Facebook* is inapposite**

UPMC argues that *Smith v. Facebook*, 745 F.App'x 8 (9th Cir. 2018), "makes UPMC's defense of the HIPAA-related allegations colorable[.]" DNR at 19, ¶ 61. But UPMC's reliance on *Smith* is misplaced. In *Smith*, the healthcare defendants were dismissed on personal jurisdiction grounds by the district court and the Ninth Circuit decision pertaining to Facebook hinged on interpretation of a Facebook adhesion contract that is no longer in effect. Contract law is state law, not federal law. Further, at oral argument, the Ninth Circuit noted that plaintiffs' real "beef" was "with the medical providers that ought not be putting this stuff out on Facebook where it can be shared and so obviously they've been dismissed for lack of personal jurisdiction, they can be sued elsewhere presumably, but it strikes that this is, if there's a problem, it's isn't with Facebook, it's with the healthcare provider.'"[8] What UPMC did here is both different and worse than occurred in *Smith*.

In *Smith*, the lead plaintiff was not a patient of any healthcare defendant, nor were all of the healthcare defendants covered entities under HIPAA. Here, Plaintiffs are patients and UPMC their provider. In *Smith*, there were no patient portal disclosures. Here, UPMC discloses personally identifiable patient data to Facebook, Google, and other third parties when a patient is on the log-in

---

[8] Oral argument, 6:42, https://www.ca9.uscourts.gov/media/view_video.php?pk_vid=0000014448

page, while they are logged in, and after they log out of the portal, enabling the third parties to tie patient status to other communications. In *Smith*, the disclosures were not made through invisible Facebook pixels or other web-bugs. In *Smith*, the disclosures were only to Facebook. Here, UPMC makes disclosures to dozens of third parties.

Other courts agree with this distinction.  In *Doe v. Virginia Mason*, a pending case involving the same plaintiffs' counsel and same expert, the court explained that the defendant hospital's reliance on *Smith* was misplaced because, among other things, "the allegations in this case are broader than sharing URL information alone" and "disclosure of specific patient's logging in to the private portal, possibly coupled with searches of medical providers and conditions immediately prior to the log-in, state a claim to a violation of [the Washington state] HCIA." *Doe v. Virginia Mason*, Order Denying Defendants' Motion to Dismiss, King County, Washington, Feb. 12, 2020.  Barnes Decl. at Ex. 7. For these reasons, UPMC's reliance on *Smith* under identical circumstances is misplaced.

### d.    HIPAA does not preempt state law privacy or contract claims

UPMC next claims it has a colorable federal defense because "certain state-law privacy standards are preempted under HIPAA." DNR at 19, ¶ 62, *citing* 45 C.F.R. § 160.203. But HIPAA preemption is floor preemption, it does not apply where "[t]he provision of State law relates to the privacy of individually identifiable health information and is more stringent than a standard, requirement, or implementation specification" under HIPAA. 45 C.F.R. § 160.203(b). As ONC explains, providers "need to be aware of … additional applicable federal, state, and local laws governing the privacy and security of health information" because "[s]tate laws that are more privacy-protective than HIPAA continue to apply."[9] This provision also explains why HIPAA compliance is not a complete defense to any action in the Complaint. In any event, it is absurd for UPMC to suggest

---

[9] https://www.healthit.gov/sites/default/files/pdf/privacy/privacy-and-security-guide.pdf at 10.

that HIPAA pre-empts state wiretap and identity theft laws. Congress "does not …hide elephants in mouseholes." *Whitman v. American Trucking Association*, 531 U.S. 457, 468 (2001).

> **e.     The Dormant Commerce Clause does not apply because nothing about this case would regulate commerce "occurring wholly outside" Pennsylvania**

UPMC next argues that it has a Dormant Commerce Clause defense. DNR at 19, ¶ 63, *citing Healy v. Beer Inst.*, 491 U.S. 324, 332 (1989). But the Dormant Commerce Clause only comes into play when a state attempts to regulate "commerce that takes place *wholly outside* of the State's borders[.]" *Id.* at 336 (emphasis added). Here, Plaintiffs are Pennsylvania residents and patients of UPMC whose treatments by and communications exchanged with UPMC occurred wholly inside Pennsylvania. UPMC is headquartered in, and runs its web-properties out of, Pittsburgh. Further, Plaintiffs allege a putative class consisting of all Pennsylvania residents who are patients of UPMC. The fact that some non-Pennsylvanian non-class members may also communicate with UPMC does not render any of Plaintiffs' claims unconstitutional. Here, Plaintiffs do not seek extra-territorial application of any Pennsylvania law. Instead, the entirety of Plaintiffs' individual claims occurred wholly inside Pennsylvania, the vast majority of the class' claims occurred wholly inside Pennsylvania, and the entirety of the communications at issue occurred, at least in part, inside Pennsylvania because that is where UPMC is headquartered and runs its web-properties.

> **f.     *Buckman* does not apply because Plaintiffs have not made a fraud-on-the-federal-agency claim**

UPMC next argues that it has a federal pre-emption defense deriving from *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001). In *Buckman*, the issue was whether a "fraud-on-the-FDA" claim was pre-empted by federal law where the statute in question had a specific, applicable pre-emption provision. Here, Plaintiffs do not have any fraud-on-a-federal agency claim and UPMC does not identify any applicable pre-emption provision. UPMC also cites *Defense Association* for this defense. But it too is inapposite because the Third Circuit explained, in that case, that it was "plausible" that

"Congress intended for no one other than the Judicial Conference and the AO to monitor and enforce a Community Defender Organization's compliance with its grant terms." *Def. Assoc. of Phila.*, 790 F.3d at 474. Here, Plaintiffs claims seek to enforce Pennsylvania state law – not federal law – and all of the federal agencies, officers, statutes, and rules cited by UPMC expressly foreclose pre-emption of state privacy laws. As CMS has stated, "No requirement of meaningful use supersedes any Federal, State, or local law regarding the privacy of a person's health information." *Stage 2 Final Rule*, 77 FR 54008 (Sept. 4, 2012).

### g.   Third Circuit law makes clear that this case is actionable under state law

Finally, UPMC ignores binding Third Circuit precedent on common law privacy claims involving Internet websites with less sensitive information than patient-provider data and communications. In *In re Google Inc. Cookie Placement Consumer Privacy Litigation*, 806 F.3d 125, 151 (3d Cir. 2015), the Court explained that an Internet user could hold a company accountable for violating its users' expectations of privacy. "Whether or not data-based targeting is the internet's pole star," the Court explained, "users are entitled to deny consent, and they are entitled to rely on the public promises of the companies they deal with." *Id.* Likewise, in *Nickelodeon Consumer Privacy Litigation*, 827 F.3d 262, 292 (3d Cir. 2016), the Court held that a company can be held liable under common law principles where it "created an expectation of privacy" and then violated it.

*Google Cookie* involved tracking of general Internet communications for advertising purposes in violation of Google's privacy promises. *Nickelodeon* involved the defendant children's television company's unauthorized acquisition and dissemination of children's personal information and communications on the Nick.com website. This case involves far more sensitive data and communications, for which there is no ***federal*** defense available.

## CONCLUSION

For all of these reasons, this matter should be remanded to the Court of Common Pleas of Allegheny County, Pennsylvania.

/s/ James C. Shah
James C. Shah (ID No. 80337)
Nathan Zipperian (ID No. 202585)
Michael Ols (ID No. 326144)
SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
1845 Walnut Street, Suite 806
Philadelphia, PA
Telephone: 610.891.9880
Facsimile: 866.300.7367
jshah@sfmslaw.com
nzipperian@sfmslaw.com
mols@sfmslaw.com

Jay Barnes (*pro hac vice* pending)
Mitchell Breit
An Truong
SIMMONS HANLY CONROY
112 Madison Avenue
New York, NY 10016-7416
Telephone: 212.784.6400
Facsimile: 212.213.5949
jaybarnes@simmonsfirm.com
mbreit@simmonsfirm.com
atruong@simmonsfirm.com

Amy Gunn
Elizabeth Lenivy
THE SIMON LAW FIRM, P.C.
800 Market Street, Suite 1700
St. Louis, MO 63101
Telephone: 314.241.2929
agunn@simonlawpc.com
elenivy@smonlawpc.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on April 13, 2020, the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ *James C. Shah*
James C. Shah
Shepherd, Finkelman, Miller & Shah, LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: 610.891.9880
Facsimile: 866.300.7367
Email: jshah@sfmslaw.com