**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JANE DOE I and JANE DOE II, on behalf of themselves and all others similarly situated, | Case No. 2:20-cv-00359-MJH |
| *Plaintiffs*, | Hon. Marilyn J. Horan |
| v. | Electronically Filed |
| UPMC, a Pennsylvania Nonprofit, Non-Stock Corporation, | |
| *Defendant*. | |

**UPMC'S MEMORANDUM OF LAW IN
OPPOSITION TO PLAINTIFFS' MOTION TO REMAND**

Rebekah B. Kcehowski (Pa. 90219)
Leon F. DeJulius, Jr. (Pa. 90383)
Anderson T. Bailey (Pa. 206485)
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219-2514
Telephone: 412.394.7935
Facsimile: 412.394.7959
rbkcehowski@jonesday.com
lfdejulius@jonesday.com
atbailey@jonesday.com

May 11, 2020                    *Counsel for UPMC*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................... ii

STANDARD OF REVIEW ............................................................................................ 2

ARGUMENT .................................................................................................................. 3

I.     UPMC Properly Removed This Case Pursuant To 28 U.S.C. § 1442(a)(1). ......... 3

      A.     UPMC Was "Acting Under" A Federal Agency. ...................................... 4

      B.     Plaintiffs' Claims Relate To Acts Under Color Of Federal Office.......... 10

      C.     UPMC Has Raised Colorable Federal Defenses..................................... 12

      D.     Plaintiffs' Remaining Arguments Are Irrelevant.................................... 15

II.    The Court Separately Should Deny Remand Pursuant to CAFA. ....................... 16

      A.     UPMC Properly Removed this Action Under CAFA............................. 16

      B.     Plaintiffs Cannot Use A Presumption To Prove An Exception To CAFA. ...................................................................................................... 18

      C.     Plaintiffs Fail To Meet Their Burden..................................................... 24

CONCLUSION............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Am. Booksellers Found. v. Dean,*
    342 F.3d 96 (2d Cir. 2003) ....................................................................... 14

*Anthony v. Small Tube Mfg. Corp.,*
    535 F. Supp. 2d 506 (E.D. Pa. 2007) ................................................. 21, 22

*Ariz. v. Manypenny,*
    451 U.S. 232 (1981) ................................................................................... 2

*Backpage.com, LLC v. Hoffman,*
    2013 WL 4502097 (D.N.J. Aug. 20, 2013) .............................................. 14

*Bell v. Thornburg,*
    743 F.3d 84 (5th Cir. 2014) ............................................................... 10, 16

*Biegenwald v. Fauver,*
    882 F.2d 748 (3d Cir. 1989) ..................................................................... 22

*Caver v. Central Ala. Elec. Cooperative,*
    845 F.3d 1135 (11th Cir. 2017) ............................................................... 15

*Ctr. for Democracy & Tech. v. Pappert,*
    337 F. Supp. 2d 606 (E.D. Pa. 2004) ....................................................... 14

*Cty. of Montgomery v. Atl. Richfield Co.,*
    795 F. App'x 111 (3d Cir. 2020) ................................................................ 9

*Dart Cherokee Basin Operating Co., LLC v. Owens,*
    574 U.S. 81 (2014) .................................................................. 3, 17, 22, 23

*Disabled in Action of Pa. v. Se. Pa. Transp. Auth.,*
    539 F.3d 199 (3d Cir. 2008) ..................................................................... 20

*Doe v. Schwerzler,*
    2007 WL 1892403 (D.N.J. June 28, 2007) .............................................. 17

**TABLE OF AUTHORITIES**
**(cont'd)**

Page

*Doe v. Sutter Health*,
  2020 WL 1331948 (Cal. Super. Ct. Jan. 29, 2020)...................................................7

*Ellis v. Montgomery Cnty.*,
  267 F. Supp. 3d 510 (E.D. Pa. 2017) ..............................................................23, 24

*Ellithy v. Healthcare Training Inst., Inc.*,
  2013 WL 3480206 (D.N.J. June 21, 2013) .............................................17, 19, 21

*Evans v. Walter Indus., Inc.*,
  449 F.3d 1159 (11th Cir. 2006) ........................................................................25

*Golden v. N.J. Inst. Tech.*,
  934 F.3d 302 (3d Cir. 2019)..............................................................................12

*Goncalves v. Rady Children's Hosp.*,
  865 F.3d 1237 (9th Cir. 2017) .......................................................................4, 11

*Gray v. Peruto*,
  481 F. App'x 716 (3d Cir. 2012) .......................................................................20

*Hagen v. Benjamin Foster Co.*,
  739 F. Supp. 2d 770 (E.D. Pa. 2010) ................................................................13

*Hargett v. RevClaims, LLC*,
  854 F.3d 962 (8th Cir. 2017) .................................................................. passim

*Hart v. FedEx Ground Package Sys. Inc.*,
  457 F.3d 675 (7th Cir. 2006) ............................................................................17

*Hood v. Gilster–Mary Lee Corp.*,
  785 F.3d 263 (8th Cir. 2015) ............................................................................19

*In re Commonwealth's Motion to Appoint*,
  790 F.3d 457 (3d Cir. 2015)..................................................................... passim

*In re Sprint Nextel Corp.*,
  593 F.3d 669 (7th Cir. 2010) .................................................................19, 22, 23

# TABLE OF AUTHORITIES
## (cont'd)

Page

*Isaacson v. Dow Chemical Co.*,
571 F.3d 129 (2d Cir. 2008)................................................................10, 12

*Jefferson County, Ala. v. Acker*,
527 U.S. 423 (1999)............................................................................... passim

*Jones v. EEG, INC.*,
2016 WL 1572901 (E.D. Pa. Apr. 18, 2016) ....................................19, 21

*Jordan v. Nationstar Mortg. LLC*,
781 F.3d 1178 (9th Cir. 2015) .............................................................22

*Kaufman v. Allstate New Jersey Ins. Co.*,
561 F.3d 144 (3d Cir. 2009)................................................................20

*Laguerre v. People's Prop. Adjusters, LLC*,
2019 WL 4007769 (E.D. Pa. Aug. 22, 2019) .....................................18

*Mason v. Lockwood, Andrews & Newnam, P.C.*,
842 F.3d 383 (6th Cir. 2016) ..............................................................23, 24

*McMorris v. TJX Cos., Inc.*,
493 F. Supp. 2d 158 (D. Mass. 2007) ................................................17, 18, 19

*McNair v. Synapse Grp. Inc.*,
672 F.3d 213 (3d Cir. 2012)................................................................20

*Mondragon v. Capital One Auto Fin.*,
736 F.3d 880 (9th Cir. 2013) ..............................................................17, 19, 22, 23

*N.L.R.B. v. Amax Coal Co.*,
453 U.S. 322 (1981)............................................................................24

*Neale v. Volvo Cars of N. Am., LLC*,
794 F.3d 353 (3d Cir. 2015)................................................................16, 17

*Nichols v. Chesapeake Operating, LLC*,
718 F. App'x 736 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 788 (2019)..........19, 24

iv

**TABLE OF AUTHORITIES**
**(cont'd)**

Page

*Papp v. Fore-Kast Sales Co.*,
   842 F.3d 805 (3d Cir. 2016)............................................................... passim

*Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc.*,
   485 F.3d 793 (5th Cir. 2007) ...............................................................19, 24

*Quackenbush v. Allstate Ins. Co.*,
   517 U.S. 706 (1996)..................................................................................22

*Reece v. AES Corp.*,
   638 F. App'x 755 (10th Cir. 2016) .........................................................19

*Schwartz v. Comcast Corp.*,
   2006 WL 487915 (E.D. Pa. Feb. 28, 2006) ......................................19, 21

*Schwartz v. Comcast Corp.*,
   256 F. App'x 515 (3d Cir. 2007) ............................................................21

*Smith v. Facebook*,
   745 F. App'x 8 (9th Cir. 2018) ...............................................................13

*Smith v. Facebook, Inc.*,
   262 F. Supp. 3d 943 (N.D. Cal. 2017) ...................................................13

*Watson v. Phillip Morris Cos., Inc.*,
   551 U.S. 142 (2007)...................................................................................9

*Weller v. Dollar Gen. Corp.*,
   2019 WL 1045960 (E.D. Pa. Mar. 4, 2019).............................................20

*Willingham v. Morgan*,
   395 U.S. 402 (1969).....................................................................................9

**STATUTES & OTHER AUTHORITIES**

28 U.S.C. § 1332...............................................................20, 22, 23, 24

28 U.S.C. § 1332(d)(2) .......................................................16, 20, 25

# TABLE OF AUTHORITIES
### (cont'd)

Page

28 U.S.C. § 1332(d)(2)(B) ..............................................................................................18

28 U.S.C. § 1332(d)(3) ...........................................................................................18, 19, 21

28 U.S.C. § 1332(d)(3)(A) ............................................................................................18

28 U.S.C. § 1332(d)(4) .............................................................................................. passim

28 U.S.C. § 1332(d)(7) ...........................................................................................18, 25

28 U.S.C. § 1441(a) ..................................................................................................16

28 U.S.C. § 1442(a)(1)............................................................................................... passim

28 U.S.C. § 1447(d) ....................................................................................................3

42 U.S.C. § 1395w-4(a)(7) .........................................................................................6

Fed. R. Evid. 301 ......................................................................................................20

Plaintiffs sue on behalf of a putative interstate class for alleged UPMC practices undertaken to help the federal government achieve specific goals regarding health information technology ("health IT") and electronic health records ("EHR"). According to the Complaint, the use of online cookies and the collection of user IP address and similar information constitutes unlawful identity theft, wiretapping, and disclosure of federally protected patient information. *See* Compl. ¶¶ 23, 112, 379-443 (ECF #1-2 at 2 of 222). The claims lack merit; the information at issue is not protected, and UPMC has met or exceeded all obligations regarding patient privacy. Regardless, Plaintiffs' claims belong in federal court for two reasons.

*First*, 28 U.S.C. § 1442(a)(1) permits removal when state litigation challenges actions taken to assist a federal agency. Hundreds of pages of exhibits that both sides have put before the Court attest to the undisputed federal interests at stake. *See, e.g.*, ECF #1-3, 12-6 – 12-9, 12-11, 12-12. Using data to improve health research, patient care, and innovation is a federal priority, and the government has partnered with private healthcare providers to modernize a system that often still depends on ubiquitous shelves of paper records. UPMC, other healthcare systems, and federal agencies all utilize alleged practices at issue in this case to advance those federal interests. Both online patient portals, and the use of online marketing to promote those portals, are commonplace, and the past months have demonstrated the advantages such new digital healthcare technologies can provide. State-law claims against those same practices threaten interference with a federal program and are removable pursuant to Section 1442(a)(1).

*Second*, the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), independently allows removal where, as in this case, proposed classes of *residents* sweep in *citizens* of other states. Undisputed evidence proves this is an interstate class action, and the other elements of CAFA removal are undisputed.

None of the arguments in Plaintiffs' brief supporting remand ("Br.") defeat federal jurisdiction. Plaintiffs cannot dispute the extensive federal oversight of health IT. They contend Section 1442 removal is limited to a "narrow" set of actions directed by a federal officer, and presume UPMC is acting *ultra vires* by violating the law. Br. at 10, 12. The Supreme Court and Third Circuit reject those arguments. In applying Section 1442(a)(1), the Court does not assume the truth of Plaintiffs' claims. Rather, the statute is liberally construed in favor of removal, including where a case challenges actions taken at the discretion of a private entity like UPMC.

With respect to CAFA, Plaintiffs principally seek remand under an exception on which they bear the burden. The exception requires proof that at least two-thirds of the putative class are citizens of Pennsylvania. But to meet that burden, Plaintiffs ask the Court to *presume* citizenship based on mere residence. The vast majority of federal courts reject that same argument as speculative guesswork inconsistent with settled jurisdictional principles.

The conduct at issue here helped realize federal policy goals. Privacy interests that Plaintiffs invoke are based on federal law. The putative class crosses state borders. And the relief they seek would not only impact UPMC's activities on a nationwide basis, but have ramifications for the federal government and its private partners throughout healthcare. Such claims can—and should—proceed in federal court.

## **STANDARD OF REVIEW**

Plaintiffs ignore three principles that govern their motion. *First*, "'the federal officer removal statute is … "broadly construed" in favor of a federal forum.'" *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 811 (3d Cir. 2016) (citations omitted). The statute ensures federal review where litigation risks interference with a federal program, *id.*, and that policy "should not be frustrated by a narrow, grudging interpretation." *Ariz. v. Manypenny*, 451 U.S. 232, 242 (1981).

*Second*, CAFA is also "'read broadly, with a strong preference that interstate class actions should be heard in a federal court if properly removed by any defendant.'" *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014) (quoting legislative record). The statute "corrects a flaw" in the diversity statute by expanding federal jurisdiction over class actions. S. Rep. 109-14, 5, 2005 U.S.C.C.A.N. 3, 6. Thus, "no antiremoval presumption attends cases invoking CAFA, which Congress enacted to facilitate adjudication of certain class actions in federal court." *Dart*, 574 U.S. at 89.

*Third*, courts do not, as Plaintiffs repeatedly suggest, assume the merits of the Complaint. The Court instead must "credit [defendant's] theory of the case," *Jefferson County, Ala. v. Acker*, 527 U.S. 423, 432 (1999), and "construe the facts in the removal notice in the light most favorable to the [defendant]." *In re Commonwealth's Motion to Appoint*, 790 F.3d 457, 466 (3d Cir. 2015) ("*Defender Association*"); *see also Dart*, 574 U.S. at 87-88.[1]

## ARGUMENT

### I. UPMC Properly Removed This Case Pursuant To 28 U.S.C. § 1442(a)(1).

Section 1142(a)(1) allows removal of any case "commenced in a State court" against "any officer (or any person acting under that officer) of the United States or of any agency thereof" and "relating to any act under color of such office." Plaintiffs do not and cannot dispute that UPMC is a "person." Def.'s Notice of Removal ¶¶ 9-11 (ECF #1) ("Notice"). This case satisfies each other element as well: UPMC was "acting under" a federal agency; the allegations "relate to" those actions; and federal defenses are at issue. *Def. Ass'n*, 790 F.3d at 467.

---

[1] The preference for removal under both Section 1442(a)(1) and CAFA also led Congress to alter the ordinary rule for appealing remand decisions. An order remanding a case removed under the federal officer statute is immediately appealable as of right. 28 U.S.C. § 1447(d). An order remanding a case removed pursuant to CAFA is appealable at the discretion of the Third Circuit. *Id*. § 1453(c)(1). Any decision remanding this case should, therefore, be held in abeyance to allow for a potential appeal.

## A.  UPMC Was "Acting Under" A Federal Agency.

Whether UPMC was "acting under" a federal officer or agency "is to be liberally construed."  *Papp*, 842 F.3d at 812.  "Acting under" requires only that the conduct "involve an effort to *assist*, or to help *carry out*, the federal supervisor's duties or tasks."  *Id*. (emphasis in the original; marks and citation omitted).  The hallmark of "acting under" is a "person" assisting a federal agency achieve some end-goal it would otherwise have its own agents complete.

The standard allows for removal of claims against discretionary actions taken to assist a federal agency.  The Third Circuit has "explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained-of conduct was done at the specific behest of the federal officer or agency."  *Papp*, 842 F.3d at 813.  In *Defender Association*, the Third Circuit rejected the argument that removal requires having "acted pursuant to a *federal duty* in engaging in the complained-of conduct."  *Def. Ass'n*, 790 F.3d at 470.  Similarly, the Third Circuit in *Papp* reversed a remand order because the district court "mistakenly posited that the only way [defendant] could show it acted under a federal officer was to show that a federal officer or agency directly prohibited" the action defendant allegedly failed to take.  *Papp*, 842 F.3d at 812.  "Nowhere [is there] support for the proposition that only non-discretionary choices qualify for removal."  *Goncalves v. Rady Children's Hosp.*, 865 F.3d 1237, 1248 (9th Cir. 2017).

UPMC is assisting the Department of Health and Human Services ("HHS") and two divisions within HHS—the Office of the National Coordinator for Health Information Technology ("ONC") and the Centers for Medicare & Medicaid Services ("CMS")—achieve long-term federal objectives regarding a nationwide health IT infrastructure and increased patient engagement with EHR.  *See* Notice ¶¶ 15-22.  Both the development of online patient resources and the *promotion* of these resources are key to this assistance.  State-court claims against these practices threaten substantial interference with UPMC, providers across healthcare, and CMS

4

itself, which deploys the same practices at issue here in furtherance of federal policy goals.

The federal government is one of the largest purchasers of healthcare services and uniquely interested in the use of EHR and health IT to bring healthcare into the 21st century. Notice ¶ 17; *see also, e.g.*, ONC, *Fed. Health Info. Tech. Strategic Plan 2011 – 2015* ("2011 Plan") (ECF #1-3 at 43 of 272). A 2004 Executive Order created the National Health Information Technology Coordinator to oversee "nationwide implementation of interoperable health information technology." *Id.* ¶ 18. Congress then codified that position as ONC, which works together with CMS, *inter alia*, to "bring more robust health information into patients' hands and ensure that technology … will help them better manage their health." ONC, *2020 – 2025 Fed. Health IT Strategic Plan* at 3 (Draft) ("2020 Plan") (ECF #1-3 at 16 of 272).[2]

This requires working "with private sector payers … to encourage providers to achieve meaningful use." 2011 Plan at 12 (ECF #1-3 at 54 of 272); *see also* Notice ¶¶ 18-22. The HITECH Act of 2009 thus enabled public-private collaboration on a nationwide "[h]ealth information technology architecture" by allocating billions of dollars to CMS for use in achieving nationwide "meaningful use" of EHR. 42 U.S.C. § 300jj-31(a)(i); *see also* Notice ¶¶ 19, 25. CMS then implemented the Meaningful Use program as "the centerpiece of the government's health IT strategy." 2011 Plan at 23 (ECF #1-3 at 65 of 272); *see also* 2020 Plan at 4 ("The federal government and private sector have worked together to help digitize …

---

[2] Recent events have vindicated this federal interest, as new health IT begins to take on greater prominence. *See, e.g.*, CMS.gov, *Trump Administration Releases COVID-19 Telehealth Toolkit to Accelerate State Use of Telehealth in Medicaid and CHIP* (Apr. 23, 2020) ("Ensuring that patients can safely receive the care they need at home minimizes travel to healthcare facilities and supports efforts to limit community spread of the virus."); *STAT News, In fading steel towns, chronically ill patients hope video visits stay after the pandemic goes* (Apr. 29, 2020) ("The number of telemedicine visits conducted by the University of Pittsburgh Medical Center (UPMC), the region's largest provider, has jumped from 250 per day in early March to nearly 9,500 per day last week, a staggering 3,700% increase.").

healthcare.") (ECF #1-3 at 17 of 272).[3]

Under the Meaningful Use program, providers that participate in the government-subsidized Medicare and Medicaid programs receive incentive payments from CMS if they meet specific criteria for increasing patient engagement with EHR—*i.e.*, meaningful use. *Id.* ¶¶ 19, 25-29. CMS sets the specific criteria, which include, for instance, adopting federally certified EHR technology ("CEHRT"), giving patients electronic access to health records and physicians, and making EHR downloadable and transferable. *Id.* ¶¶ 20-29.[4]

UPMC providers have long contracted with CMS to provide services to Medicare and Medicaid enrollees and have additionally participated in the Meaningful Use program since 2011. Notice ¶¶ 39, 46. CMS pays UPMC additional money beyond standard Medicare reimbursements for meeting Meaningful Use criteria. K. Powers Decl. ¶ 6 (ECF #1-4). To meet certain of those criteria, UPMC relies exclusively on MyUPMC, its online patient portal (MyUPMC.UPMC.com). *Id.* ¶ 3. UPMC then uses certain online tools to promote MyUPMC, increase patient engagement with EHR, and ensure meaningful use. According to those who help manage the effort: "[C]ookies on UPMC's main public website" and "website analytic

---

[3] As noted in the Notice, the Meaningful Use program has also been known as the EHR Incentive Program and Promoting Interoperability Program, and CMS has at various times changed the specific criteria providers are expected to meet. Notice ¶¶ 24, 28 n.2. Because the term "Meaningful Use" is used in the HITECH Act and was the most common name for the program, it is used here. *See, e.g.*, 42 U.S.C. § 1395w-4(a)(7).

[4] Plaintiffs do not contest any of this background, including the origin, purpose, and structure of the Meaningful Use program. They note that CMS occasionally changed specific criteria within the Meaningful Use program; that UPMC submitted a comment to the federal government disagreeing with proposed EHR requirements; and that providing services to federally subsidized healthcare patients does not by itself support removal. Br. at 11, 17. But none of that is relevant. Federal officer removal here is based on much more than caring for Medicare patients, and Plaintiffs' own exhibits establish how the Meaningful Use program announced "staged requirements for providers to demonstrate progressively more integrated use of EHRs." ONC, *Guide to Privacy and Security of Electronic Health Information* at 32 (ECF #12-6 at 33 of 50).

programs" are how UPMC "ensure[s] that the MyUPMC patient portal is well known";

"understand[s] usage patterns"; ensures "users have the most user-friendly experience"; expands

"engagement with the EHR"; and "ensure[s] that UPMC hospitals meet federal Meaningful Use

Program criteria."  K. Powers Decl. ¶ 5 (ECF #1-4); K. Scott Decl. ¶ 6 (ECF #1-5).

These are standard practices in healthcare for achieving meaningful use.  Web-based

platforms are the way to establish meaningful use of EHR.  *See* Notice ¶¶ 30-31.  Meaningful

Use requirements include ensuring that patients can "access[] their health information online"

and move medical "information from online to physical electronic media."  CMS, Stage 3

Objectives and Measures at 2 (ECF #1-3 at 150 of 272).  This effectively requires a portal.

Moreover, "[j]ust making a portal available to patients will not ensure that they will use it.  The

portal must be engaging and user-friendly."  How to Optimize Patient Portals for Patient

Engagement and Meet Meaningful Use Requirements at 1 (ECF #1-3 at 163 of 272).  In 2013,

ONC recommended that providers "[u]nderstand how a patient portal helps achieve meaningful

use requirements," "[i]mplement proactive, engaging portal features," and "[a]ctively promote

and facilitate portal use."  *Id*.  Maintaining and promoting online patient portals is how

healthcare providers "assist" and "help carry out" the federal goal of meaningful use.[5]

These are also practices that CMS itself would be utilizing if it had the same relationship

with patients.  *See Def. Ass'n*, 790 F.3d at 469 (removal proper where defendant provided "a

service the federal government would itself otherwise have to provide").  CMS operates its own

---

[5] Indeed, Plaintiffs' counsel has brought claims against providers across the country for promoting their own online patient portals.  Plaintiffs' brief references one such case pending in Washington State.  *See* Br. at 22.  Similar claims are proceeding in California, Maryland, and Massachusetts, as well.  *See, e.g.*, *Doe v. Sutter Health*, 2020 WL 1331948 (Cal. Super. Ct. Jan. 29, 2020) (dismissing without prejudice privacy, wiretapping, intrusion upon seclusion, and negligence claims based on defendant's "My Health Online" patient portal).

online portal for Medicare beneficiaries, and it steers patients to that portal using the same promotional techniques at issue in this case. Notice ¶ 34. That includes "web beacons," "persistent cookies," and "behaviorally targeted advertising" with its websites as a way to help "reach new people," "personalize … content" for individual users, and improve online experience for Medicare beneficiaries. Notice ¶¶ 36-38; *see also* Medicare.gov Privacy Policy (ECF #1-3 at 167-75 of 272). CMS likewise uses nearly two dozen third-party service providers, including Facebook and Google Analytics, to analyze and promote its websites. Notice ¶ 36. When a user visits Medicare.gov, CMS and, "in some cases, our third-party service providers, can collect … information about your visit, including" IP address, geographic location, and pages visited, *id.* at 168 of 272, just as Plaintiffs allege UPMC does here. *See also* Medicare.gov Privacy Information Regarding Third-Party Services (ECF #1-3 at 179-87 of 272).

This case thus falls squarely in the essential purpose of the federal officer removal statute—protecting federal operations and programs from interference through state-court litigation. *Def. Ass'n*, 790 F.3d at 466. Plaintiffs seek a judgment that data-gathering practices that CMS itself deploys constitute, *inter alia*, identity theft under Pennsylvania law. Plaintiffs summarily conclude that there is "no threat that state court litigation in this case will interfere with government operations." Br. at 18. But they do not contest that the federal government is doing the same things alleged against UPMC here. Notice ¶¶ 34-38. A state court adjudication that UPMC—and, by extension, CMS—is stealing identities and violating the law is exactly the kind of state interference against which Section 1442(a)(1) protects by ensuring federal judicial review. The outcome of this case could chill nationwide meaningful use efforts by CMS and private healthcare providers across the United States.

Binding precedent forecloses Plaintiffs' other arguments for remand.  Plaintiffs contend that "the Third Circuit confined [federal officer removal] to a narrow scope of actions."  Br. at 12.  But the scope of the federal officer removal statute has never been "narrow or limited." *Willingham v. Morgan*, 395 U.S. 402, 406 (1969).  The Third Circuit holds "that the words 'acting under' are broad, and … that the statute must be liberally construed."  *Def. Ass'n*, 790 F.3d at 468 (marks and citations omitted).  CMS pays UPMC for assistance with achieving meaningful use of EHR by patients of UPMC providers.  UPMC—just like CMS and providers throughout healthcare—is achieving meaningful use criteria in part through practices alleged here.  That is the "assistance" that warrants removal.  *Id*. at 468.

Plaintiffs also ignore the Third Circuit decisions rejecting any requirement that a federal agency specifically direct the alleged actions.  *See supra*.  Plaintiffs repeatedly argue that no federal law "requires UPMC's conduct," Br. at 9; that no "agency directed UPMC" to make the alleged disclosures, *id*. at 10; that "UPMC fails to show that it was acting at the behest of a federal officer," *id*. at 10; and that there are multiple ways to promote EHR, *id*. at 11.  Whether or not UPMC is *required* to promote meaningful use in a specific way is immaterial.  UPMC is still "acting under" HHS, CMS, and ONC when it takes discretionary actions for the purpose of meeting meaningful use criteria.  *See, e.g.*, *Def. Ass'n*, 790 F.3d at 470 (removal does not require that defendant act "pursuant to a federal duty in engaging in the complained-of conduct").[6]

---

[6] Plaintiffs also cite *Watson v. Phillip Morris Cos., Inc.*, 551 U.S. 142 (2007), and *Cty. of Montgomery v. Atl. Richfield Co.*, 795 F. App'x 111 (3d Cir. 2020), to argue that regulatory compliance is insufficient for removal.  Br. at 17-18.  That is inapposite; Plaintiffs concede the Meaningful Use program is voluntary.  Br. at 9, 11, 12, 14.  UPMC did not remove because it is complying with federal regulations.  It removed because the claims target how UPMC meets goals regarding meaningful use that ONC and CMS identify and for which CMS remits payment—the kind of "effort to *assist*" that the Third Circuit looks for in removal cases.  *Cty. of Montgomery*, 795 F. App'x at 113.

The specific nature of Plaintiffs' claims is irrelevant. The federal officer statute applies regardless of whether the claims "mention" the Meaningful Use program or invoke state-law theories of liability. Br. at 13; *see also, e.g.*, *Papp*, 842 F.3d at 809 (removing product liability claims); *Bell v. Thornburg*, 743 F.3d 84, 88-89 (5th Cir. 2014) (removing state-law employment claims). What matters is whether the alleged actions were taken "to *assist*, or to help *carry out*, the federal supervisor's duties or tasks." *Papp*, 842 F.3d at 812 (emphasis in original). Here, UPMC takes alleged actions in order to implement the Meaningful Use program and receives payment from CMS for meeting meaningful use criteria. Claims alleging that assistance violates state law are removable under Section 1442(a)(1). *See id.*; *see also Def. Ass'n*, 790 F.3d at 470.

## B. Plaintiffs' Claims Relate To Acts Under Color Of Federal Office.

The third element of federal officer removal requires some nexus between Plaintiffs' allegations and the federal activities. "The hurdle erected by this requirement" has always been "quite low." *Isaacson v. Dow Chemical Co.*, 571 F.3d 129, 137 (2d Cir. 2008). Congress lowered it even further in 2011 by amending the statute to allow removal of claims "relating to" actions under color of federal office—an amendment "'intended to broaden the universe of acts that enable Federal officers to remove to Federal court.'" *Def. Ass'n*, 790 F.3d at 467 (quoting legislative record). The Third Circuit's "permissive view" requires only "a connection or association between the act in question and the federal office." *Id.* at 471.

The undisputed evidence proves that connection here. To meet requirements of the Meaningful Use program, including EHR access, UPMC uses not just the online patient portal, but also cookies and website analytics on certain UPMC websites to promote the portal and make it user-friendly—just as the government advises as part of the Meaningful Use program, and just as the government is doing in its own efforts to encourage use of EHR. *See* K. Powers Decl. ¶ 3 (ECF #1-4); K. Scott Decl. ¶ 6 (ECF #1-5); *see* Notice ¶¶ 33, 38, 42, 44. The

Complaint challenges actions UPMC takes because UPMC is seeking to expand the use of EHR and meet Meaningful Use criteria. Even before the 2011 statutory amendment, that connection would satisfy the causation prong. *See Def. Ass'n*, 790 F.3d at 471 (prior to 2011, "relating to" shown where defendant acted "'because of what they were asked to do by the Government'" (citation omitted)). The new, broader standards of Section 1442(a)(1) are met as well. *See Goncalves*, 865 F.3d 1244 (causation satisfied where the act that formed the basis for the suit "is an act … [defendants] contend they performed under the direction of federal officers" (marks and citation omitted)).

Plaintiffs' arguments again misstate the legal standards and bases for removal. They contend that UPMC's actions lack the required nexus because UPMC is "in violation of … federal officers' express duties to protect patient privacy." Br. at 19. But courts do not assume the truth of a plaintiff's allegations under Section 1442(a)(1). *Jefferson County*, 527 U.S. at 432 (it "would defeat the purpose of the removal statute" to choose which side is correct at this stage); *Def. Ass'n*, 790 F.3d at 466 (construing "facts in the removal notice in the light most favorable to the" removing defendant). Plaintiffs are also wrong to argue that "UPMC's actions are wholly divorced from any requirements or incentives by any federal office." Br. at 19. Removal does not depend on whether the government *required* the alleged actions. *See supra*.

Plaintiffs ignore the undisputed evidence that cookies and other analytic tools are in fact how UPMC meets Meaningful Program criteria for which the federal government pays UPMC. Decl. of K. Powers ¶¶ 4-5 (ECF #1-4); Decl. of K. Scott ¶¶ 3-6 (ECF #1-5). Far from being "wholly divorced" from each other, the Meaningful Use program and UPMC's alleged conduct

are directly related.[7]  That satisfies the "relating to" inquiry under Section 1442(a)(1).

## C.    UPMC Has Raised Colorable Federal Defenses.

The final prong asks whether UPMC has a federal defense.  *Def. Ass'n*, 790 F.3d at 473.

Here, too, courts eschew "'narrow, grudging interpretation,'" *Golden v. N.J. Inst. Tech.*, 934 F.3d

302, 310 (3d Cir. 2019) (citation omitted), and impose "few limitations on what qualifies,"

*Isaacson*, 517 F.3d at 138.  And, UPMC does not need to show that it will *prevail*.  *See Jefferson*

*County*, 527 U.S. at 431 (defendant need not "'win his case before he can have it removed'"

(citation omitted)).  What matters is that a "colorable" defense "raises a federal question."  *Def.*

*Ass'n*, 790 F.3d at 473.

Plaintiffs directly accuse UPMC of violating federal law.  Their Complaint expressly

cites "federal law" as a source of UPMC's alleged "duties of confidentiality," and relies on

Plaintiffs' interpretations of provisions in the Code of Federal Regulations to aver that IP

addresses and user cookies constitute protected personal information.  Compl. ¶¶ 23, 112, 117,

136 (citing HIPAA).  Plaintiffs' motion to remand repeats the allegation that "UPMC's actions

violate HIPAA," a federal statute.  Br. at 16 n.5.  This case puts at issue whether actions taken in

the course of a federal program violate federal law, and UPMC's defense that they did not is

sufficient to trigger Section 1442(a)(1).  *See Def. Ass'n*, 790 F.3d at 472-73 (federal defense

present where parties disputed the scope of federal duties); *Golden*, 934 F.3d at 310-11 (same).

Without citing any authority, Plaintiffs attempt to minimize this as a *factual* question.  Br.

---

[7] Plaintiffs' grocery analogy is misleading.  Br. at 20.  This is not a data breach case, as the analogy implies.  The analogy might be more apt if Plaintiffs' imaginary grocer were partnering with the FTC as part of a decades-long program to build a nationwide credit card database and facilitate greater flexibility in consumer spending; was being incentivized by the federal government to encourage credit card use; and was intentionally collecting credit card information and analyzing the data to help track usage rates.  But there, Section 1442(a)(1) would permit removal of allegations that the grocer acted illegally by encouraging and tracking credit card use.

at 21.  Many defenses that support removal depend on some factual issue.  Plaintiffs' own allegations about the scope of HIPAA still present inherently *federal* questions.  And there is no legitimate dispute that UPMC's defense to those allegations is colorable:  Courts passing on similar allegations have held (as a matter of law) that the "connection between a person's browsing history and his or her own state of health is too tenuous" for HIPAA's disclosure requirements to apply.  *See Smith v. Facebook*, 745 F. App'x 8, 9 (9th Cir. 2018).[8]

It is irrelevant whether this constitutes a "complete defense," as Plaintiffs argue.  Br. at 20.  The statute itself does not require a "complete defense," and imposing one would be contrary to binding precedent that requires a liberal construction and looks only to whether "'it appears that a Federal question … must be decided.'"  *Def. Ass'n*, 790 F.3d at 472-73 (quoting *Mesa v. California*, 489 U.S. 121, 126-27 (1989)).  Plaintiffs cite the Third Circuit's decision in *Papp* as requiring a "complete defense."  Br. at 20.  The only reference in that case to a "complete defense" comes in a parenthetical quoting a district court decision, and neither the Third Circuit nor the trial court decision it cited analyzed whether a complete defense is actually required.  *See Papp*, 842 F.3d at 815; *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 782-83 (E.D. Pa. 2010).  Moreover, the federal defense at issue in *Papp* was not "complete."  There were several defendants in that case, and only one, Boeing, removed under Section 1442(a)(1).  Even if Boeing prevailed in full, there still would have been several claims remaining in the case.

---

[8] Plaintiffs, whose own counsel filed *Smith*, attempt to distinguish the case because the healthcare defendants were dismissed for lack of personal jurisdiction, and the remaining defendant did not have a doctor-patient relationship with plaintiffs.  Br. at 21-22.  That misses the point for two reasons.  *First*, the question in *Smith* was whether HIPAA protected the information at issue, and the analyses in both the trial and appellate courts focused on the nature of the information.  *See Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 954-55 (N.D. Cal. 2017); *see also Smith*, F. App'x at 9.  *Second*, UPMC only needs to show that its defense is colorable. *Smith* leaves no room for doubt on that point.

Dormant commerce clause preemption applies to all claims in any event. Notice ¶¶ 63-64. Plaintiffs argue the defense is inapplicable because their personal claims allegedly occurred within Pennsylvania. Br. at 23. But preemption is not limited to claims that *exclusively* regulate commerce outside of Pennsylvania; it applies where state law *also* would regulate commerce that occurs outside of Pennsylvania. *See, e.g.*, *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097 (D.N.J. Aug. 20, 2013) (enjoining state law that would apply both to commerce within the state and commerce outside the state). Patients in other states are visiting UPMC websites from within those other states, then visiting UPMC providers in those other states. *See* Notice ¶ 64. Even assuming some aspect of their online activity physically occurs in Pennsylvania due to the nature of electronic web-based communications, that does not negate the Dormant Commerce Clause. *See Am. Booksellers Found. v. Dean*, 342 F.3d 96, 103 (2d Cir. 2003) ("Because the internet does not recognize geographic boundaries, it is difficult, if not impossible, for a state to regulate internet activities without project[ing] its legislation into other States."); *Ctr. for Democracy & Tech. v. Pappert*, 337 F. Supp. 2d 606, 662 (E.D. Pa. 2004). Plaintiffs ultimately do not contest that extra-territorial impact is inevitable, and UPMC's preemption defense could "reasonably be asserted, given the facts presented and the current law." *Papp*, 842 F.3d at 815.

UPMC's HIPAA and *Buckman* preemption defenses also support removal. Notice ¶¶ 62, 65. In response, Plaintiffs repeat the erroneous claim that a "complete defense" is required, and deny that preemption applies because Plaintiffs pursue state law claims and do not allege fraud-on-the-agency. Br. at 22, 24. Those arguments are not defenses against removal. *See Jefferson County*, 527 U.S. at 431 (defendant does not have to "win his case before he can have it removed"). Moreover, there was no fraud-on-the-agency claim in *Defender Association* either; the claim that plaintiffs were "attempting to interfere in the relationship between the" defendant

and a federal agency was sufficient for removal under *Buckman*. *Def. Ass'n*, 790 F.3d at 474. That is the case here as well. Plaintiffs' claims threaten the means by which UPMC advances the goals of the federal Meaningful Use program. The claims cannot proceed inconsistent with supreme federal law, and UPMC's defenses asserting that supremacy support removal under Section 1442(a)(1). *Def. Ass'n*, 790 F.3d at 474 (preemption defense supports removal); *Caver v. Central Ala. Elec. Cooperative*, 845 F.3d 1135, 1146 (11th Cir. 2017) (affirming removal based on conflict where "state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress'" (citation omitted)).

### D. Plaintiffs' Remaining Arguments Are Irrelevant.

Plaintiffs scatter throughout their brief a series of arguments that are irrelevant and premised on incorrect law. *First*, Plaintiffs detail at length the federal interest in patient privacy. Br. at 14-17. That is not a reason for remand; it shows the concentrated *federal* interest at issue in this case. Questions about the federal expansion of health IT, federal privacy laws, and the use of technology to build a nationwide EHR infrastructure overlay this action. Plaintiffs argue there is no "federal duty to encourage providers to share patient data." Br. at 16. That is contrary to *Defender Association* and prejudges the merits in a way that the Supreme Court prohibits. *See Jefferson County*, 527 U.S. at 432 ("[W]e credit the [defendants'] theory of the case for purposes" of the jurisdictional inquiry.); *Def. Ass'n*, 790 F.3d at 470. If Plaintiffs' argument is that UPMC's actions "are not lawful," Br. at 16, then remand must be denied.

*Second*, Plaintiffs argue the Court should not entertain federal officer removal because of "grave"—though unspecified—"constitutional issues." Br. at 8. Plaintiffs suggest removal would invalidate Section 1442 because of the constitutional right to privacy. This again assumes contrary to precedent that UPMC is violating the law. Regardless, the argument is meritless. Every case removed pursuant to Section 1442(a)(1) involves some claim of illegality, and no

"constitutional concern" comes from a proper assertion of jurisdiction just to resolve the claim.

*Finally*, Plaintiffs note that their claims are actionable under state law. Br. at 17, 24. This, too, is irrelevant. Many federal officer removal cases involve state-law claims. *See e.g.*, *Papp*, 842 F.3d at 815 (product liability claim); *Bell*, 743 F.3d at 91 (state law wrongful termination claim). Federal claims would be removable under 28 U.S.C. § 1441(a). But cases, like this one, that allege state law prohibits actions taken to assist the federal government are removable under Section 1442(a)(1). The Court should deny remand on that basis alone.

## II. The Court Separately Should Deny Remand Pursuant To CAFA.

CAFA independently confers federal jurisdiction over this case. Plaintiffs do not meaningfully challenge that jurisdiction. Instead, they invoke an exception on which they bear the burden of proof, then ask the Court to presume that burden is met. Plaintiffs fail to note that the overwhelming majority of federal courts have rejected that same argument.

### A. UPMC Properly Removed this Action Under CAFA.

Plaintiffs make a cursory argument that UPMC provided "no evidence" to support CAFA jurisdiction. Br. at 2. To the contrary, ample evidence attached to the Notice of Removal, including sworn declarations and exhibits, confirms jurisdiction. *See* Notice ¶¶ 70-90.

CAFA gives federal courts original jurisdiction when three elements are present: (1) so-called "minimal diversity," which exists where "any member of a [putative] class … is a citizen of a State different from any defendant"; (2) the size of the putative class is at least 100; and (3) the matter in controversy exceeds $5,000,000. 28 U.S.C. § 1332(d)(2). Plaintiffs do not challenge the second and third elements, which are therefore established absent "legal certainty" to the contrary. *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 357 n.1 (3d Cir. 2015).[9]

___

[9] There is no basis for doubt as to either element. Undisputed sworn testimony proves sufficient putative class size. ECF #1-5 at ¶ 7. Moreover, the notice of removal "need include

Plaintiffs' conclusory argument that there is "no evidence" of minimal diversity is wrong. UPMC need only show by a preponderance of the evidence that *one* putative class member is not a Pennsylvania citizen. Courts have held this showing was made based solely on a class defined to include qualifying "Residents of Massachusetts," since, "by definition, the class may include foreign citizens who resided in Massachusetts." *McMorris v. TJX Cos., Inc.*, 493 F. Supp. 2d 158, 162 (D. Mass. 2007). The Court can thus find jurisdiction based on Plaintiffs' definition of the class alone. Compl. ¶ 367 (defining class as "Pennsylvania residents").

The evidence UPMC already presented also proves minimal diversity. *See, e.g.*, *Hart v. FedEx Ground Package Sys. Inc.*, 457 F.3d 675, 677 (7th Cir. 2006) (employee affidavits attest that members of the putative class were not citizens of Pennsylvania); *Ellithy v. Healthcare Training Inst., Inc.*, 2013 WL 3480206, at *3 (D.N.J. June 21, 2013) (declaration that records indicate one putative class member was not a citizen of New Jersey). Students at Pennsylvania schools come from other States, rely on UPMC providers for their healthcare while here, use UPMC websites, and will leave Pennsylvania after graduation for other States. *See* Notice ¶¶ 76-81; *see also* Decl. of K. Scott ¶ 7 (ECF #1-5); *Doe v. Schwerzler*, 2007 WL 1892403, at *2 (D.N.J. June 28, 2007) (treating out-of-state students as citizens of their home state).

In addition, medical residents working at UPMC on J-1 Visas reside in Pennsylvania, rely on UPMC for healthcare, utilize UPMC websites, and are required to return to their country of origin when the Visa expires. Decl. of A. Roman ¶¶ 4-6 (describing foreign citizens within UPMC's residency program) (attached as Ex. A); Decl. of L. Foust ¶ 4 (confirming some of

---

only a plausible allegation" of the amount in controversy. *Dart*, 574 U.S. at 89. As alleged here, and as Plaintiffs do not dispute, the request for statutory damages and class-wide royalty, as well as the possible fee-shifting, plausibly exceed $5 million. Notice ¶¶ 95–101; *see also Neale*, 794 F.3d at 357 n.1 (holding that uncontested allegations regarding potential damages and class size were sufficient to establish the amount in controversy).

these individuals are also patients and portal users) (attached as Ex. B). Patients awaiting transplants are required to relocate to Pittsburgh for weeks or months at a time to be in close proximity in the event an organ becomes available. Decl. of T. Watson ¶¶ 6-10 (attached as Ex. C). Such individuals resided in Pennsylvania on the date this case was filed and also establish minimal diversity. *See* 28 U.S.C. § 1332(d)(2)(B) (foreign citizen creates minimal diversity); *id.* § 1332(d)(7) (assessing class status as of the date the complaint was filed).[10] *See, e.g.*, *Laguerre v. People's Prop. Adjusters, LLC*, 2019 WL 4007769, at *5 (E.D. Pa. Aug. 22, 2019) (persons in the United States on temporary visas remain citizens of county of origin).

### B.   Plaintiffs Cannot Use A Presumption To Prove An Exception To CAFA.

Plaintiffs principally seek remand based on the "exception" provision in Section 1332(d)(4). *See* Br. at 2-7. Accordingly, remand here requires that Plaintiffs prove two-thirds or more of the class are Pennsylvania citizens. *See* 28 U.S.C. § 1332(d)(4). As Plaintiffs acknowledge, they bear the burden of proof under Third Circuit precedent. Br. at 2 (citing *Kaufman v. Allstate New Jersey Ins. Co.*, 561 F.3d 144, 149 (3d Cir. 2009)).

Notably, Plaintiffs do not invoke CAFA's discretionary exception in Section 1332(d)(3). That provision permits remand at the Court's discretion if between one- and two-thirds of the putative class members are Pennsylvania citizens and certain other factors are considered, including whether the claims "involve matters of national or interstate interest." 28 U.S.C. § 1332(d)(3)(A). Plaintiffs do not cite this provision, identify the elements of the exception, or develop any argument or facts in favor of discretionary remand. They cannot meet their burden

---

[10] As set forth in the Notice of Removal, additional categories of populations independently establish diversity. *See* Notice ¶¶ 83-86. But minimal diversity is not based on categories. Any person who resided in Pennsylvania as of the filing date of the Complaint who is a citizen of another state establishes diversity. *See McMorris*, 493 F. Supp. 2d at 162; *see also* 28 U.S.C. § 1332(d)(7) (class status determined as of filing date of the complaint).

without addressing these factors. *See, e.g.*, *Mondragon v. Capital One Auto Fin.*, 736 F.3d 880, 886 (9th Cir. 2013) (plaintiff seeking remand cannot prove CAFA exception without evidence). Any argument under Section 1332(d)(3) is, therefore, waived.

Nor do Plaintiffs carry their burden to show that two-thirds—or any other percent—of the class are citizens of Pennsylvania. They argue that the class definition requires Pennsylvania "residency." Br. at 2. Under settled law, *citizenship* and *residency* are not the same. Citizenship requires residency coupled with a factual finding of intent to remain indefinitely. *Jones v. EEG, Inc.*, 2016 WL 1572901, at *2 (E.D. Pa. Apr. 18, 2016) (analyzing precedent distinguishing residency and citizenship). This is a subjective inquiry that typically entails analysis of, *e.g.*, where one works, is registered to vote, pays taxes, owns property, maintains financial accounts, and joins religious organizations or other associations. *Id.*

Plaintiffs thus turn to an argument that almost every court to consider the issue has rejected: that "residency creates a rebuttable presumption of citizenship." Br. at 4. In making this argument, Plaintiffs fail to inform the Court that federal courts construing Section 1332(d)(4) are nearly unanimous in refusing to presume citizenship based on residency. *See, e.g.*, *Hargett v. RevClaims, LLC*, 854 F.3d 962 (8th Cir. 2017); *Hood v. Gilster–Mary Lee Corp.*, 785 F.3d 263, 265–66 (8th Cir. 2015); *Mondragon v. Capital One Auto Fin.*, 736 F.3d 880 (9th Cir. 2013); *In re Sprint Nextel Corp.*, 593 F.3d 669 (7th Cir. 2010); *Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc.*, 485 F.3d 793 (5th Cir. 2007).[11] For several reasons, this Court should align itself with that precedent and reject Plaintiffs' presumption of citizenship based on residency.

---

[11] *See also Nichols v. Chesapeake Operating, LLC*, 718 F. App'x 736, 741 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 788 (2019); *Reece v. AES Corp.*, 638 F. App'x 755, 770 (10th Cir. 2016); *McMorris*, 493 F. Supp. 2d at 165-66; *Jones*, 2016 WL 1572901, at *3-4; *Ellithy*, 2013 WL 3480206, at *4; *Schwartz v. Comcast Corp.*, 2006 WL 487915, at *6 (E.D. Pa. Feb. 28, 2006).

*First*, the presumption creates conflict within the statute itself. *See Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*, 539 F.3d 199, 212 (3d Cir. 2008) (same word used in different parts of a statute should have the same meaning). The word "citizen" is used in Sections 1332(a) and 1332(d)(2), as well as in the home state provision of Section 1332(d)(4). For both Sections 1332(a) and 1332(d)(2), "residency" does not make one a "citizen." *See McNair v. Synapse Grp. Inc.*, 672 F.3d 213 (3d Cir. 2012) (allegation of residency is "jurisdictionally inadequate" under Section 1332(d)(2)); *Gray v. Peruto*, 481 F. App'x 716 (3d Cir. 2012) (allegation of residency insufficient to establish citizenship for Section 1332(a)). The Court should not interpret Section 1332 in a way that creates disharmony within the statute itself. *Hargett*, 854 F.3d at 966 ("§ 1332(a)'s citizenship/residency distinction applies in § 1332(d)(4)").

*Second*, the presumption conflicts with how the Third Circuit applies the CAFA exceptions. The Third Circuit—like most courts—holds that a plaintiff seeking remand has the burden of proof to establish an exception under Section 1332(d)(4). *Kaufman v. Allstate N.J. Ins. Co.*, 561 F.3d 144, 153-54 (3d Cir. 2009) (citing *Serrano v. 180 Connect, Inc.*, 478 F.3d 1018, 1024 (9th Cir. 2007)). But a presumption is not evidence; it is a mechanism that shifts the burden of proof to a different party. *See* Fed. R. Evid. 301. Because the Third Circuit places the burden of proof on Plaintiffs, this Court should not shift it to UPMC through a presumption.

Nor is there any reason to shift the burden. Information about citizenship is not in UPMC's possession. UPMC does not collect data about patients' subjective intentions or the typical indicia of citizenship, such as where they pay taxes, vote, and register their cars. Moreover, courts in Pennsylvania have sanctioned class action defendants in certain circumstances for making contact with putative class members even prior to certification. *Weller v. Dollar Gen. Corp.*, 2019 WL 1045960, at *1 (E.D. Pa. Mar. 4, 2019). Information about the

class is, if anything, constructively in the possession of Plaintiffs' counsel.

*Third*, other Third Circuit precedent suggests that court would follow the majority and reject Plaintiffs' proposed presumption. In *Schwartz v. Comcast Corp.*, the district court refused to remand under the home state rule after rejecting the plaintiff's arguments "that residence is an effective proxy for domicile" and finding that less than one-third of class members were Pennsylvania citizens. 2006 WL 487915, at *6. In a later appeal, the Third Circuit agreed "the District Court properly exercised jurisdiction." *Schwartz v. Comcast Corp.*, 256 F. App'x 515, 517 n.1 (3d Cir. 2007). And, outside of CAFA, the "Third Circuit has long held that bare allegations of residence are not sufficient for purposes of establishing citizenship." *Anthony v. Small Tube Mfg. Corp.*, 535 F. Supp. 2d 506, 515 (E.D. Pa. 2007) (citing cases and denying plaintiffs' motion for remand; marks omitted).

The presumption is also contrary to the majority of district courts within this Circuit, as the majority requires evidence of citizenship. *See, e.g.*, *Anthony*, 535 F. Supp. 2d at 517; *Jones*, 2016 WL 1572901, at *5; *Ellithy*, 2013 WL 3480206, at *5; *Dicuio v. Brother Int'l Corp.*, 2011 WL 5557528, at *5 (D.N.J. Nov. 15, 2011). This Court should align with the majority of district court cases within this Circuit, which adhere to the language of Section 1332.

*Fourth*, the presumption is inconsistent with other aspects of CAFA. As noted, Congress created different types of exceptions depending on whether the number of putative class members who are citizens of the home state is at least two-thirds or less than two-thirds. *Compare* 28 U.S.C. § 1332(d)(3) (discretionary exception), *with id.* ¶ 1332(d)(4) (mandatory exceptions). The different exceptions require different analyses. *Id.* § 1332(d)(3) (court must consider, *inter alia*, "whether the claims asserted involve matters of national or interstate interest" and "whether the class action has been pleaded in a manner that seeks to avoid Federal

jurisdiction"). Courts should not end-run Congressional line-drawing by just assuming that everyone is a citizen of the state in which they reside. *See Mondragon*, 736 F.3d at 884 (dismissing a presumption of citizenship based on residence as "guesswork").

*Fifth*, conflating residence and citizenship creates the kind of "antiremoval presumption" that the Supreme Court disavowed. *Dart*, 574 U.S. at 89. The statute is to be interpreted liberally to *favor* removal. *See id*.; *Jordan v. Nationstar Mortg. LLC*, 781 F.3d 1178, 1184 (9th Cir. 2015) ("Congress and the Supreme Court have instructed us to interpret CAFA's provisions under section 1332 broadly in favor of removal."). It frustrates that purpose to presume that an exception requiring remand based on citizenship can be satisfied through residency alone.

*Sixth*, the CAFA exceptions are not jurisdictional and thus should not be construed in a way that defeats the Court's "strict duty to exercise the jurisdiction that is conferred upon [it] by Congress." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996). Courts instead treat the exceptions as abstention doctrines. *See Anthony*, 535 F. Supp. 2d at 514. And, in the Third Circuit, abstention is "in all its forms, the exception, not the rule," and an "extraordinary and narrow exception to the district court's duty to adjudicate a controversy properly before it." *See Biegenwald v. Fauver*, 882 F.2d 748, 750 (3d Cir. 1989) (marks and citations omitted).

For all of these reasons, courts refuse to presume citizenship based on residency even where it might be "sensible" to do so. *Hargett*, 854 F.3d at 966. Like in this case, the plaintiff in *Hargett*, "defined the class as all persons who were Arkansas residents at the time the medical services" were provided. 854 F.3d at 965. In *Mondragon*, the proposed class comprised people with cars registered in California, and the court thought it "likely that most of the prospective class members—we would guess more than two-thirds of them—were California citizens." 736 F.3d at 884. In *Sprint*, the court noted that the "vast majority" of the putative class—people who

had a Kansas cell phone number, a Kansas billing address, and paid a Kansas fee—were likely Kansas citizens. 593 F.3d at 671. But in each case, the circuit reversed a decision to remand because citizenship cannot be presumed from residence. The plaintiff, as master of the complaint, chose to define the class broadly in a way not limited by citizenship, and the "tradeoff" for doing so was the burden to produce evidence of citizenship for a CAFA exception. *Sprint*, 593 F.3d at 676; *see also Hargett*, 854 F.3d at 966; *Mondragon*, 736 F.3d at 885.

Neither of the two cases on which Plaintiffs rely warrants disregarding this authority. Br. at 4 (citing *Mason v. Lockwood, Andrews & Newnam, P.C.*, 842 F.3d 383 (6th Cir. 2016); *Ellis v. Montgomery Cnty.*, 267 F. Supp. 3d 510 (E.D. Pa. 2017)). The reasoning in both cases is flawed. Neither decision acknowledges it is interpreting "citizen" differently for different parts of Section 1332. The court in each case agreed residence is *insufficient* to establish citizenship under Section 1332(a), but then failed to explain as a matter of statutory interpretation why "citizen" as used in Section 1332(d)(4) should be applied inconsistently. *See Mason*, 842 F.3d at 393; *Ellis*, 267 F. Supp. 3d at 517. These two decisions improperly treat this issue as a question about dueling common-law presumptions. It is not. Courts applying CAFA exceptions are interpreting a statute, and the volumes of precedent narrowly interpreting "citizen" in Section 1332(a) compel the same interpretation for Section 1332(d). *Hargett*, 854 F.3d at 965 ("[T]he term 'citizen' in 28 U.S.C. § 1332 has long meant something different from 'resident.'").

*Mason*—which has been criticized—also neglects the Supreme Court's admonition that "no antiremoval presumption attends cases invoking CAFA." *Dart*, 574 U.S. at 89. (*Ellis* was not a removal case.) The Sixth Circuit reasoned that parties invoking a CAFA exception face no "countervailing presumption" against remand. *Mason*, 842 F.3d at 392. That is wrong. CAFA enacts "a strong preference" for federal review of interstate class actions. *Dart*, 574 U.S. at 89.

*Mason* and *Ellis* also fail to reckon persuasively with broadly interpreting *non-jurisdictional* exceptions to CAFA in a way that defeats federal jurisdiction. *See Mason*, 842 F.3d at 392-93. The dissent in *Mason* criticized the majority for derogating "the 'virtually unflagging obligation of the federal courts to exercise the jurisdiction given them.'" *Id.* at 399. Courts since *Mason* have agreed with the dissent. *Hargett*, 854 F.3d at 966 n.2; *Nichols*, 718 F. App'x at 741. The *Mason* majority's response—that Congress itself codified the CAFA exceptions—ignores that Congress predicated the test on *citizenship* presumably with the understanding that citizenship under Section 1332 requires more than residency. *See also N.L.R.B. v. Amax Coal Co.*, 453 U.S. 322, 329 (1981) (where Congress uses a term with a common law meaning, courts presume Congress intended to incorporate that meaning).

*Mason* and *Ellis* get it wrong. The presumption Plaintiffs propose is contrary to Section 1332, the majority rule, Third Circuit precedent, and basic jurisdictional principles.

### C. Plaintiffs Fail To Meet Their Burden.

Without a presumption, Plaintiffs cannot carry their burden. Their only other argument restates the same flawed presumption. They look at "total resident population" of Pennsylvania, then carve-out the 8% that allegedly comprises students and service members and assume those groups are *not* citizens. Br. at 5-6. That says nothing about the remaining 92%. Plaintiffs only presume everyone in that 92% is a citizen. But that presumption, even where it may seem plausible, is contrary to the language of Section 1332 and settled precedent regarding citizenship and CAFA. Plaintiffs have the burden under Section 1332(d)(4) to produce evidence of citizenship, and for all the reasons set forth above, courts refuse to presume citizenship based on residence alone. Take away the presumption, and Plaintiffs' argument falls apart.

The 2018 Census data Plaintiffs cite is also "much too broad for any court to rely on in determining the citizenship of a class member." *Preston*, 485 F.3d at 802. The proposed class is

not Pennsylvania's "total resident population" in 2018; it is those residents who, as of January 24, 2020, "are, or were, patients of UPMC or any of its affiliates, and who used UPMC's web properties." Compl. ¶ 367 (ECF #1-2 at 83 of 222); *see also* 28 U.S.C. § 1332(d)(7) (class judged as of the date complaint was filed). Plaintiffs must prove citizenship of two-thirds of that proposed class. They present no evidence that statewide population data apply equally to the class defined in the Complaint. "Total resident population" is the wrong denominator.

Plaintiffs also use the wrong numerator. UPMC's Notice discusses students, service members, and retirees as proof this is an interstate class under Section 1332(d)(2). *See* Notice ¶¶ 70-90. But those are not the exclusive categories of diverse putative class members; any member may be diverse. That includes transplant patients, foreign residents, former employees, and any number of other people. The circumstances are as individualized as the putative class members themselves, yet Plaintiffs produce no evidence beyond statewide residency statistics.

Plaintiffs, not UPMC, chose to define the class to sweep in all qualifying residents, and if "evidence of class citizenship might be difficult to produce," that "is to a considerable degree a function of the composition of the class designed by plaintiffs." *Evans v. Walter Indus., Inc.*, 449 F.3d 1159, 1166 (11th Cir. 2006). It remains Plaintiffs' burden to prove the citizenship of the total class, and there is no evidence that Pennsylvania citizens comprise less than a third of the class, between one-third and two-thirds of the class, or at least two-thirds.[12]

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion to Remand.

---

[12] Nor will discovery of UPMC's records shed light on that issue, for the reasons stated above and more fully set forth in opposition to Plaintiffs' conditional motion for discovery. UPMC does not as a matter of course collect information relevant to determining citizenship.

Dated: May 11, 2020

Respectfully submitted,

  /s/  *Rebekah B. Kcehowski*
Rebekah B. Kcehowski (Pa. 90219)
Leon F. DeJulius, Jr. (Pa. 90383)
Anderson T. Bailey (Pa. 206485)
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219-2514
Telephone: 412.394.7935
Facsimile: 412.394.7959
rbkcehowski@jonesday.com
lfdejulius@jonesday.com
atbailey@jonesday.com

*Counsel for UPMC*

**CERTIFICATE OF SERVICE**

I hereby certify that this 11th day of May, 2020, I caused UPMC's Memorandum of Law in Opposition to Plaintiffs' Motion to Remand and the accompanying Exhibits to be filed over the Court's electronic filing system, which will cause service to be made on all counsel of record.

_/s/ Rebekah B. Kcehowski_
Rebekah B. Kcehowski
_Counsel for UPMC_