IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JANE DOE I and JANE DOE II, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br> vs.<br><br>UPMC,<br><br>    Defendant. | 2:20-cv-359<br><br>Judge Marilyn J. Horan |

**OPINION AND ORDER**

Plaintiffs, currently proceeding under pseudonyms,[1] filed the present class action against Defendant UPMC in the Court of Common Pleas of Allegheny County, Pennsylvania. (ECF No. 1-2). Plaintiffs seek redress under Pennsylvania law for UPMC's alleged disclosure of Plaintiffs' personally identifiable information to third parties for internet marketing purposes without Plaintiffs' knowledge or authorization. UPMC removed the matter to federal court, citing two bases: federal officer removal jurisdiction, under 28 U.S.C. § 1442(a)(1), and class action diversity jurisdiction, pursuant to the Class Action Fairness Act, at 28 U.S.C. § 1332(d). (ECF No. 1). Plaintiffs seek remand of the case back to state court. (ECF No. 11). In support of their Motion to Remand, Plaintiffs filed two additional Motions. The first asks the Court to allow discovery related to citizenship of the class members. (ECF No. 13). The second asks the Court to take judicial notice of certain Census information related to citizenship of the class members,

---

[1] Plaintiffs filed a Motion to Proceed Under Pseudonym along with their Complaint. (ECF No. 1-2, at 209). The parties have stipulated that said Motion should be decided by the court that ultimately addresses the merits of this case, that is, after this Court decides the Motion to Remand. (ECF No. 4).

as well as a letter from UPMC to the federal government. (ECF No. 15). The parties have briefed the issues, (ECF Nos. 12, 14, 16, 22, 24, 26, 27, 35), and the Court heard oral argument on the Motion to Remand. The Motions are now ripe for decision.

For the following reasons, the Motion to Remand will be denied, and both the Motion for Jurisdictional Discovery and the Request for Judicial Notice will be denied as moot.

**I. Background**

Plaintiffs bring this action individually and on behalf of a class of plaintiffs consisting of "[a]ll Pennsylvania residents who are, or were, patients of UPMC or any of its affiliates, and who used UPMC's web properties, including, but not limited to, UPMC.com and the Patient Portal at myupmc.upmc.com." (ECF No. 1-2, at ¶ 367). According to the Complaint, UPMC "encourages patients to exchange communications" through its website and patient portal "to search for a doctor, learn more about their conditions and treatments, access medical records and test results, and make appointments." *Id.* at ¶ 5. Plaintiffs allege that UPMC then re-directs certain personally identifiable information and patient communication content from its website and patient portal to third parties, such Facebook and Google, for marketing purposes without patients' consent. *Id.* at ¶¶ 10–13. Plaintiffs contend that through this conduct, UPMC fails to uphold its obligations and promises to protect patients' privacy. *Id.* at ¶¶ 3, 6–11. Plaintiffs thus bring the following claims: in Count I, breach of provider-patient confidentiality; in Count II, violation of Pennsylvania's Wiretapping and Electronic Surveillance Control Act, 18 P.S. § 5701 *et seq.*; in Count III, violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 *et seq.*; in Count IV, identity theft, in violation of 40 P.S. § 4120; in Count V, negligence; and in Count VI, intrusion upon seclusion.

UPMC removed the matter to federal court primarily on the basis of the federal officer removal jurisdiction, found at 28 U.S.C. § 1442. (ECF No. 1). In UPMC's Notice of Removal, UPMC states that when it engaged in the complained-of conduct, it was acting under the Department of Health and Human Services (DHHS), the Centers for Medicare and Medicaid Services (CMS), and the Office of the National Coordinator for Health Information Technology, to implement DHHS's voluntary electronic health records incentive program, known as the EHR Incentive Program or, more commonly, the Meaningful Use Program. *Id.* at ¶¶ 16–24. Through the Meaningful Use Program, the federal government makes incentive payments to healthcare providers who increase their use of, as well as patient engagement with, electronic health records, or "EHR." *Id.* at ¶ 14. This program came about as a result of the federal government's goal of a "'nationwide implementation of interoperable health information technology in both the public and private health care sectors.'" *Id.* at ¶ 18 (quoting Exec. Order 13,335, 69 Fed. Reg. 24,059 (Apr. 27, 2004)). According to UPMC, Plaintiffs' claims "effectively ask[] a court to intervene in the operation of a federal program and hold that the federal government, UPMC, and most other healthcare systems are all violating state law." *Id.* at 1–2. As such, UPMC argues, this matter belongs in federal court. *Id.* Plaintiffs disagree. (ECF Nos. 11, 12).

UPMC also contends that removal is proper under the Class Action Fairness Act (CAFA), at 28 U.S.C. § 1332(d), in that the amount in controversy exceeds $5,000,000 and minimal diversity exists. (ECF No. 1, at ¶ 66). In response, Plaintiffs argue that the "home state" exception to CAFA applies, which requires the Court to remand the matter to state court if more than two-thirds of the class are citizens of the same state as the primary defendant. (ECF No. 12, at 8). Plaintiffs ask that the Court take judicial notice of certain information and that they be allowed to engage in discovery related to the citizenship of the potential class, so that

3

they may show that more than two-thirds of the class are citizens of Pennsylvania. (ECF No. 13, 15).

**II. Discussion**

A defendant who faces a lawsuit in state court may remove that lawsuit to federal court when certain jurisdictional criteria are met. 28 U.S.C. §§ 1441–55. The defendant must, among other things, provide a "notice of removal . . . containing a short and plain statement of the grounds for removal." 28 U.S.C. § 1446. Much like a complaint, the notice of removal "must allege the underlying facts supporting each of the requirements for removal jurisdiction." *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Ass'n of Phila.* (*Defender Ass'n*), 790 F.3d 457 (3d Cir. 2015) (internal quotations omitted).

If the plaintiff believes that removal was improper—that the federal court does not have subject matter jurisdiction or that the defendant did not follow the proper removal procedure—then the plaintiff may ask the federal court to remand the lawsuit to the state court. 28 U.S.C. § 1447(c). A motion to remand is analyzed under the same framework as a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 811 (3d Cir. 2016). The removing defendant, as the party seeking to invoke the court's subject matter jurisdiction, thus carries the burden of establishing the court's jurisdiction. *Samuel-Bassett v. Kia Motors Am., Inc.*, 357 F.3d 392, 396 (3d Cir. 2004). The plaintiff may challenge whether the defendant has done so, through either a facial challenge or a factual challenge to the notice of removal. *Papp*, 842 F.3d at 811. In a facial challenge, the court looks to the face of the notice of removal and accepts as true the facts alleged by the defendant. *Id.*; *Hartig Drug Co. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016) (explaining that a facial 12(b)(1) challenge is similar to a 12(b)(6) motion to dismiss for failure to state a claim). If the court cannot

conclude, based on facts alleged in the notice of removal, that the jurisdictional requirements are met, then the court must remand the matter to state court. 28 U.S.C. § 1447(c). A factual challenge, however, "involves the presentation of competing facts," but "should only be considered to the extent that the facts presented, if persuasive, would directly undermine" an element required for jurisdiction. *Papp*, 842 F.3d at 811 and n.4.

Plaintiffs here challenge the Court's jurisdiction under both the federal officer removal statute and CAFA. As to federal officer removal, Plaintiffs raise a facial challenge to the Notice of Removal. The Court therefore must analyze the Notice of Removal, as it pertains to federal officer removal, much in the same way it would a complaint under Rule 12(b)(6). Regarding removal under CAFA, however, Plaintiffs raise a factual challenge by offering competing facts and by seeking discovery concerning the citizenship of the potential class. As the Court will explain, the Court does not need to reach the CAFA issue, as the Motion to Remand can be resolved on federal officer removal grounds.

A. Federal officer removal

The federal officer removal statute provides, in relevant part, that a state civil action may be removed to federal court if it "is against or directed to . . . [t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). This removal statute differs from other removal statutes in two significant ways. First, most removal statutes "are to be strictly construed against removal and all doubts should be resolved in favor of remand." *A.S. v. SmithKline Beecham Corp.*, 769 F.3d 204, 208 (3d Cir. 2014) (internal quotations omitted). In contrast, the federal officer removal statute is to be construed broadly and in favor of removal. *Defender Ass'n*, 790 F.3d at 466–67.

Second, the well-pleaded complaint rule generally applies to removal statutes, but the federal officer removal statute is excepted from that rule. *Id.* at 466. The well-pleaded complaint rule says that, absent diversity jurisdiction, "a defendant may not remove a case to federal court unless the plaintiff's complaint establishes that the case arises under federal law." *Kircher v. Putnam Funds Trust*, 547 U.S. 633, 644 n.12 (2006). The federal officer removal statute, however, is based on whether the defendant's notice of removal states a colorable federal defense. *Defender Ass'n*, 790 F.3d at 466.

In order for a defendant to properly remove under this statute, the defendant must show that (1) he is a "person" within the meaning of the statute; (2) the plaintiff's claims are based upon the defendant's conduct "acting under" the United States, its agencies, or its officers; (3) the plaintiff's claims against him are "for or relating to" an act under color of federal office; and (4) the defendant raises a colorable federal defense to the plaintiff's claims. *Id.* at 467. UPMC and Plaintiffs contend, and the Court agrees, that UPMC is a "person" within the meaning of the federal officer removal statute. *See id.* at 467–68 (holding that "person" includes corporations and other business entities). The parties dispute the other three elements.

*i. Whether UPMC was "acting under" the United States, its agencies, or its officers*

The first element that the parties dispute is whether Plaintiffs' claims are based upon UPMC's conduct "acting under" the United States, its agencies, or its officers. As explained by the Supreme Court and the Third Circuit, "[t]he words 'acting under' describe 'the triggering relationship between a private entity and a federal officer.'" *Id.* at 468 (quoting *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 149 (2007)). Although "acting under" suggests something "akin to an agency relationship," *Cty. of San Mateo v. Chevron Corp.*, 960 F.3d 586, 599 (9th Cir. 2020) (citing *Watson*, 551 U.S. at 151), the phrase is broad and, like the federal

6

officer removal statute as a whole, should be construed liberally, *Defender Ass'n*, 790 F.3d at 468; *Papp*, 842 F.3d at 812. Thus, the relevant inquiry to determine the existence of the requisite relationship is not whether there is an agent-principal arrangement between the private entity and the government. *See Watson*, 551 U.S. at 156 (indicating that the types of relationships that may trigger the federal officer removal statute include, but are not limited to, those established by contract or payment, employer-employee relationships, and agent-principal arrangements). Rather, the proper question is whether the private entity's complained-of conduct "'involve[s] an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior.'" *Defender Ass'n*, 790 F.3d at 468 (quoting *Watson*, 551 U.S. at 152).

Supreme Court and Third Circuit decisions provide some boundaries for this broad inquiry into what constitutes "an effort to assist, or to help carry out" a federal superior's duties or tasks. As an initial matter, it is not necessary that the complained-of conduct be done at the specific behest of the federal superior. *Papp*, 842 F.3d at 813. It is enough that the complained-of conduct took place while the private entity provided assistance to the federal superior. *Id.* Moreover, any dispute about whether the allegedly wrongful conduct was outside the scope of the private entity's duties is the very thing that should be left to a federal court to decide. *Defender Ass'n*, 790 F.3d at 472 ("As the Supreme Court has noted, whether a federal officer defendant has completely stepped outside of the boundaries of its office is for a federal court, not a state court, to answer."). After all, the federal officer removal statute is triggered when the plaintiff's "allegations are directed at the relationship between the [private entity-defendant] and the [federal officer or agency]." *Id.* at 470.

The "classic case of such assistance" occurs when a private contractor helps the federal government by producing an item that it needs. *Papp*, 842 F.3d at 812 (citing *Watson*, 551 U.S.

at 153).  Likewise, a private entity is "acting under" a federal officer when the government uses that private entity "to achieve an end it would have otherwise used its own agents to complete." *Id.* (internal quotations omitted).  For example, in *Papp v. Fore-Kast Sales Co.*, the plaintiff brought a failure-to-warn product liability suit in state court against several defendants, including Boeing.  *Id.* at 809.  The plaintiff alleged that his wife "suffered secondary 'take home' asbestos exposure while washing the work clothes of her first husband."  *Id.*  Her first husband's work involved sandblasting the landing gear of C-47 military cargo planes, which were built by Boeing's predecessor company for the United States Navy and Air Force.  *Id.*  Boeing removed the matter to federal court on the basis of the federal officer removal statute.  *Id.* at 810.  The Third Circuit found that *Papp* presented "an archetypal case" of an entity "acting under" a federal officer, in that the plaintiff's allegations were "directed at actions Boeing took while working under a federal contract to produce an item the government needed, to wit, a military aircraft, and that the government otherwise would have been forced to produce on its own."  *Id.* at 813.

Similarly, in *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Association of Philadelphia*, the Commonwealth of Pennsylvania and several Pennsylvania counties sought to prevent attorneys from the Federal Community Defender Organization from representing clients in state post-conviction proceedings.  *Defender Ass'n*, 790 F.3d at 461.  The Federal Community Defender removed the matter to federal court under the federal officer removal statute.  *Id.*  The Third Circuit noted that the Federal Community Defender was created through the Criminal Justice Act, in part for the purpose of providing representation to indigent federal habeas corpus petitioners.  *Id.* at 472.  As such, the Third Circuit found, "the Federal Community Defender's representation of state prisoners in

[Pennsylvania's Post-Conviction Review Act] proceedings is closely related to its duty to provide effective federal habeas representation." *Id.* The court thus held that the Federal Community Defender "provides a service the federal government would itself otherwise have to provide." *Id.* at 469. The Federal Community Defendant was therefore "acting under" the federal government when it engaged in the conduct that the plaintiffs sought to stop. *Id.*

In contrast, however, "compliance (or noncompliance) with federal laws, rules, and regulations does not by itself [bring a party] within the scope of the statutory phrase 'acting under' a federal 'official.'" *Watson*, 551 U.S. at 153. In *Watson v. Philip Morris Companies, Inc.*, Philip Morris argued that it was entitled to federal officer removal because it was subject to detailed regulation and supervision by the Federal Trade Commission (FTC) in relation to cigarette testing. *Id.* The Supreme Court disagreed, stating that "though we find considerable regulatory detail and supervision, we can find nothing that warrants treating the FTC/Philip Morris relationship as distinct from the usual regulator/regulated relationship." *Id.* at 157. The Court noted that a "[a] contrary determination would expand the scope of the statute considerably, potentially bringing within its scope state-court actions filed against private firms in many highly regulated industries." *Id.* at 153. The Court explained that neither the language nor purposes of the federal officer removal statute supported expanding the statute to such a degree. *Id.* at 152.

In summary, something more than regulation by the federal government or compliance with federal law by the private entity is required to establish an "acting under" relationship between the private entity and the federal government. That said, the burden is not so high that a private entity must establish that it has an agency relationship with the federal government. The

9

private entity need only show that the allegations in the complaint are directed at the private entity's efforts to assist a federal superior.

According to UPMC, Plaintiffs' allegations are directed at UPMC's efforts to assist the federal government in building a nationwide network of interoperable health information technology. (ECF No. 1, at 1). The federal government, as one of the largest purchasers of healthcare services, "has emphasized the important role that health [information technology] plays in improving both the quality and efficiency of healthcare in the United States." *Id.* at ¶¶ 16–17. To that end, President Bush first established the National Health Information Technology Coordinator by executive order in 2004. Exec. Order No. 13,335, 69 Fed. Reg. 24,059 (Apr. 27, 2004). The National Coordinator, an advisor to the Secretary of DHHS, was "to provide leadership for the development and nationwide implementation of an interoperable health information technology infrastructure to improve the quality and efficiency of health care." *Id.* The National Coordinator's responsibilities included coordinating efforts of the public and private healthcare sectors and collaborating with public and private interests. *Id.*

Then, in 2009, Congress enacted the Health Information Technology for Economic and Clinical Health Act (HITECH Act),[2] which created the Office of the National Coordinator for Health Information Technology (ONC) within DHHS. 42 U.S.C. § 300jj-11. The HITECH Act gave the ONC much the same responsibilities and objectives as the 2004 executive order gave the National Coordinator, including coordinating and collaborating with the private healthcare sector. *Id.* The Act also appropriated funds for DHHS to "invest in the infrastructure necessary to allow for and promote the electronic exchange and use of health information for each

---

[2] The HITECH Act was enacted as a part of the American Recovery and Reinvestment Act of 2009, at Pub. L. No. 111-5, Title XIII, 123 Stat. 115 (2009). The HITECH Act is codified in scattered sections of title 42 of the United States Code.

individual in the United States." 42 U.S.C. § 300jj–31. In that vein, the Act created the Meaningful Use Program. 42 U.S.C. §§ 1395w-4(o), 1395ww(n); 42 C.F.R. § 495.2. Under this program, eligible healthcare providers receive incentive payments from DHHS if they demonstrate "meaningful use" of certified EHR technology. 42 U.S.C. §§ 1395w-4(o), 1395ww(n); 42 C.F.R. § 495.2.

DHHS structured the Meaningful Use Program in stages. 75 Fed. Reg. 44,321–22; 42 C.F.R. §§ 495.20–495.24. At each progressive stage, DHHS increased the criteria required to receive greater incentive payments. 75 Fed. Reg. 44,321–22; 42 C.F.R. §§ 495.20–495.24. For example, to receive incentive payments at Stage 2, an eligible provider must, among other things, show that a certain percentage of patients' health records are available to the patients in an electronic format. (ECF No. 1-3, at 144–45 (CMS, *EHR Incentive Programs for Eligible Professionals: What You Need to Know for 2015 Tipsheet*)). At Stage 3, an eligible provider must show that a certain percentage of patients have also actually accessed their records electronically. *Id.* at 149 (CMS, *Eligible Professional Medicaid EHR Incentive Program Stage 3 Objectives and Measures, Objective 6 of 8*). According to UPMC, "[o]nline patient portals have been the most effective and efficient way to meet many of the objectives in the federal Meaningful Use Program." (ECF No. 1, at ¶ 30). And, meeting the program's criteria relative to patient participation and usership requires raising awareness of a provider's website and patient portal, as well as ensuring that the website and portal are "engaging and user-friendly." *Id.* at 1; (ECF No. 1-3, at 163 (ONC, *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements*)).

UPMC, as a participant in the Meaningful Use Program, receives incentive payments from DHHS for its development and use of the UPMC website and the MyUPMC portal in

11

accordance with the program's criteria. (ECF No. 1, at ¶ 39). In particular, UPMC must, among other things, raise awareness and increase usability of the UPMC website and the MyUPMC portal. *Id.* at 1, ¶ 42. Plaintiffs' Complaint addresses the design and functionality of UPMC's website and patient portal, implicating UPMC's implementation of the Meaningful Use Program, particularly as the implementation involves patient engagement and usership. The fact that the government offers payment in exchange for UPMC's voluntary participation in implementing a nationwide EHR network shows the relationship between UPMC and DHHS is less like the regulator-regulated relationship in *Watson* and more like the government contractor relationship in *Papp*. And, Plaintiffs' allegations are directed at this relationship. UPMC is therefore "acting under" a federal superior for purposes of the federal officer removal statute.

> *ii. Whether Plaintiffs' claims are "for or relating to" an act under color of federal office*

Next, the parties dispute whether Plaintiffs' claims are "for or relating to" an act under color of federal office. To establish this element, the removing defendant only needs to show that there is "a 'connection' or 'association' between the act in question and the federal office." *Defender Ass'n*, 790 F.3d at 471. This is a broad standard: as noted by the Third Circuit, Congress's addition of "or relating to" in 2011 "was intended to broaden the universe of acts that enable Federal officers to remove to Federal court." *Id.* at 471–72 (internal quotations omitted). Here, Plaintiffs' allegations target mechanisms by which UPMC manages and markets its website and patient portal. There is plainly a connection or association between UPMC's website management and marketing strategies and the Meaningful Use program, particularly the incentives that are tied to patient participation and usability. Plaintiffs' claims are therefore "for or relating to" an act under color of federal office.

12

*iii. Whether UPMC has raised a colorable federal defense*

Lastly, the parties dispute whether UPMC has raised a defense that is both colorable and based in federal law. A defense is colorable if it is "'legitimate and [could] reasonably be asserted, given the facts presented and the current law.'" *Papp*, 842 F.3d at 815 (quoting *Colorable Claim*, Black's Law Dictionary (10th ed. 2014)). This does not mean, however, that the defendant must "win his case before he can have it removed." *Id.* (internal quotations omitted); *see also Cessna v. REA Energy Coop., Inc.*, 753 Fed. App'x. 124, 128 (3d Cir. 2018) (quoting *Jefferson County v. Acker*, 527 U.S. 423, 432 (1999)) ("But '[t]o choose between' these competing interpretations of . . . the law 'is to decide the merits of this case,' which 'would defeat the purpose of the removal statute.'"). As to the requirement that the defense be based in federal law, the Third Circuit has explained that "[t]his requirement assures that federal courts have Article III jurisdiction over federal officer removal cases." *Defender Ass'n*, 790 F.3d at 473. Accordingly, federal officer removal is "allowed if, and only if, 'it appears that a Federal question or a claim to a Federal right is raised in the case, and must be decided therein.'" *Id.* at 472 (quoting *Mesa v. California*, 489 U.S. 121, 126–27 (1989)).

Here, UPMC argues that it will raise four colorable federal defenses in response to the Complaint: a duty-based defense under the Health Insurance Portability and Accountability Act (HIPAA); preemption of Plaintiffs' state law claims by HIPAA; *Buckman* preemption; and the dormant Commerce Clause.

*a. Duty-based defense under HIPAA.* The most common type of defense is a duty-based defense. *Defender Ass'n*, 790 F.3d at 473. In the federal officer removal context, a duty-based defense must be one that is "based on a federal duty to act, or the lack of such a duty," such as denying alleged violations of a federal duty. *Id.* at 473–74. In the present Complaint, Plaintiffs

13

make several allegations related to HIPAA. First, Plaintiffs identify UPMC as a covered entity under HIPAA. (ECF No. 1-2, at ¶ 17). Second, the Complaint contains a section entitled "UPMC's Duties of Confidentiality," under which the first subsection is "Federal Law." *Id.* at ¶¶ 23–26. Citing HIPAA, Plaintiffs allege in this subsection that "a health care provider may not disclose personally identifiable information about a patient, potential patient, or household member of a patient for marketing purposes without the patient's express written authorization." *Id.* at ¶ 23. And lastly, Plaintiffs allege that under HIPAA, an IP address is considered personally identifiable information, and that cookies and browser fingerprints are protected personal identifiers. *Id.* at ¶¶ 112, 117, 136. In the Notice of Removal, UPMC disagrees and states that it will argue "that the data at issue—the content of web searches, IP addresses, cookies, and browser fingerprints—are not subject to HIPAA." (ECF No. 1, at ¶ 59). Plaintiffs plainly allege that UPMC has a federal duty under HIPAA and that UPMC violated that duty. Because UPMC denies violating its duties under HIPAA, UPMC raises a colorable federal defense.

    *b. Preemption defenses.* A defense based on federal preemption of state law is also sufficient to raise a colorable federal defense for the purposes of the federal officer removal statute. *Defender Ass'n*, 790 F.3d at 473; *Cessna v. REA Energy Coop., Inc.*, 753 Fed. App'x. 124, 128 (3d Cir. 2018). UPMC raises two preemption defenses. First, UPMC contends that "certain state-law privacy standards are preempted under HIPAA." (ECF No. 1, at ¶ 62). Whether or not that is true is for a federal court to decide, as it will require the interpretation of a federal statute. Second, UPMC argues that *Buckman* preemption applies here. In *Buckman*, the plaintiffs alleged that the defendant made fraudulent representations to the Food and Drug Administration in order to obtain approval of a medical device. *Buckman Co. v. Plaintiffs' Legal*

*Comm.*, 531 U.S. 341, 343 (2001). The Supreme Court held that the plaintiffs' state-law fraud-on-the-FDA claims were impliedly preempted by the Federal Food, Drug, and Cosmetic Act because those state-law claims "inevitably conflict[ed] with the FDA's responsibility to police fraud consistently with the Agency's judgment and objectives." *Id.* at 348–50. The Court explained that federal preemption is warranted where "the relationship between a federal agency and the entity it regulates is inherently federal in character." *Id.* at 347. UPMC argues that the nature of its involvement in DHHS's Meaningful Use Program is inherently federal. (ECF No. 1, at ¶ 65). UPMC thus contends it is entitled to federal judicial review to assess allegations that implicate its relationship with DHHS and involvement in the Meaningful Use Program. *Id.* Having already found that UPMC was "acting under" DHHS when it engaged in the complained-of conduct, it follows that the relationship between UPMC and DHHS is "inherently federal" in nature, such that the issue of whether Plaintiffs' state-law claims are preempted under the principles articulated in *Buckman* should be decided by a federal court. In sum, UPMC's HIPAA preemption and *Buckman* preemption defenses are colorable federal defenses.

  c. *Dormant Commerce Clause.* Lastly, the dormant Commerce Clause "prohibits state laws that unduly restrict interstate commerce." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019). Accordingly, "a state law that has the 'practical effect' of regulating commerce occurring wholly outside that State's borders is invalid under the Commerce Clause." *Healy v. Beer Inst.*, 491 U.S. 324, 332 (1989). Presently, UPMC avers that it has providers in states outside of Pennsylvania; its patients come from around the globe; and its website and patient portal "provide an easily accessible, interstate (and international) platform by which providers, patients, and others can manage or learn more about their or others' healthcare." (ECF No. 1, at ¶ 64). UPMC asserts that Plaintiffs' Complaint alleges that

15

"Pennsylvania law—including the legislative proscriptions of the Commonwealth's wiretapping and trade practices statutes—restricts how UPMC can design and manage" its website and patient portal.  *Id.*  Relying on a Second Circuit case (perhaps because there does not appear to be a Third Circuit case on point), UPMC argues that the dormant Commerce Clause provides a defense to Plaintiffs' claims, because "'it is difficult, if not impossible, for a state to regulate internet activities without projecting its legislation into other States.'"  *Id.* at ¶ 63 (quoting *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 103 (2d Cir. 2003) (internal quotations omitted)).  Because the dormant Commerce Clause is federal law, and because it presents a defense that is "legitimate and [could] reasonably be asserted, given the facts presented and the current law," *Papp*, 842 F.3d at 815 (internal quotations omitted), UPMC has raised a colorable federal defense.

In conclusion, UPMC has pleaded facts supporting removal under the federal officer removal statute.  UPMC has shown that by its participation in the Meaningful Use Program, it was "acting under" DHHS when it engaged in the conduct that is at issue in the Complaint.  Furthermore, the complained-of conduct is "for or relating to" an act under color of office, and UPMC has raised several colorable federal defenses.  Consequently, Plaintiffs' Motion to Remand will be denied.

B. Removal under CAFA

Having found that this Court has subject matter jurisdiction under the federal officer removal statute, the Court does not need to reach the issue of whether it also has jurisdiction under CAFA.  Accordingly, the Court will not address the parties' CAFA arguments or Plaintiffs' additional Motions filed in support of their Motion to Remand at this time.

### III. Conclusion

THEREFORE, based on the foregoing, Plaintiffs' Motion to Remand this matter to state court is hereby DENIED. Additionally, Plaintiffs' Motion for Jurisdictional Discovery is DENIED AS MOOT, and Plaintiffs' Request for Judicial Notice is DENIED AS MOOT.

IT IS SO ORDERED.

DATE July 31, 2020

Marilyn J. Horan
United States District Judge